IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civils Action No. 18-cv-2948-PAB-NRN

JEFFREY T. MAEHR,

Plaintiff,

v.

UNITED STATES Department of State, including Secretary of State Mike Pompeo, in his official capacity,

Defendants.

---

## MAEHR'S RESPONSE TO THE GOVERNMENT'S MOTION TO DISMISS [DKT. 46]

---

69141464.3

# TABLE OF CONTENTS

I.     SUMMARY ...................................................................................................... 1

II.    RESPONSE TO THE GOVERNMENT'S BACKGROUND ........................................ 1

III.   ARGUMENT ..................................................................................................... 2

       A.     Standard of review ....................................................................... 2

       B.     This Court has mandamus jurisdiction over the State
              Department and Secretary of State Pompeo. .................................. 4

       C.     The passport revocation regime is unconstitutional under the
              Supreme Court's existing privileges and immunities
              jurisprudence. ............................................................................... 6

             1.     Privileges and immunities jurisprudence applies here ...................... 6

             2.     Status of civil rights protections under the Privileges
                   and Immunities Clauses ......................................................... 7

             3.     The constitutional right of international travel is
                   protected from congressional abridgment under the
                   Article IV Section 2 Privileges and Immunities Clause. .................. 11

       D.     The passport revocation regime violates substantive due
              process .......................................................................................... 14

             1.     The right to travel internationally is a fundamental
                   right ........................................................................................ 15

             2.     Even if international travel is not a fundamental right,
                   the passport revocation regime still violates due
                   process unless limited by *ne exeat* principles. ............................. 23

             3.     The prior passport revocation regime to collect child
                   support is distinguishable – children's lives and
                   welfare depend on child support. ......................................... 27

             4.     The Government's additional arguments lack merit. ...................... 29

IV.    CONCLUSION ................................................................................................ 30

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adamson v. California,*
    332 U.S. 46 (1947) ..........................................................................................17

*Aetna Cas. & Sur. Co. v. Markarian,*
    114 F.3d 346 (1st Cir. 1997) ........................................................................ 25

*Aptheker v. Secretary of State,*
    378 U.S. 500 (1964) ..................................................... 11, 12, 18, 26

*Atherton v. Gopin,*
    355 P.3d 804 (N.M.App. 2015) ............................................................ 24, 25

*Ayotte v. Planned Parenthood of N. New England,*
    546 U.S. 320 (2006) ...................................................................................... 3

*Brown v. Mississippi,*
    297 U.S. 278 (1936) ...................................................................................... 22

*Bull v. United States,*
    295 U.S. 247 (1935) ..................................................................................28, 29

*In re Byrom,*
    316 S.W.3d 787 (Tex.App. 2010) .............................................................. 24

*C.K. v. Shalala,*
    883 F.Supp. 991 (D.N.J. 1995), *aff'd* 92 F.3d 171 (3d Cir. 1996) ................................ 20

*Califano v. Aznavorian,*
    439 U.S. 170 (1978) .............................................................................. *passim*

*Califano v. Jobst,*
    434 U.S. 47 (1977).................................................................................. 19, 20

*Carter v. Grace Whitney Properties,*
    939 N.E.2d 630 (Ind.App. 2010)............................................................... 24

*Citizens United v. Federal Election Commission,*
    558 U.S. 310 (2010)........................................................................................ 3

69141464.3

*Crandall v. Nevada,*
  73 U.S. 35 (1868) ..................................................................................... 13, 14

*Crutcher v. Commonwealth,*
  141 U.S. 47 (1891) .......................................................................................... 10

*Ecopetrol S.A. v. Offshore Expl. & Prod. LLC,*
  172 F.Supp.3d 691 (S.D.N.Y. 2016) ............................................................. 24

*Edwards v. California,*
  314 U.S. 160 (1941) ......................................................................................... 13

*Eunique v. Powell,*
  302 F.3d 971 (9th Cir. 2002) ........................................................... 21, 22, 27, 28

*Franceschi v. Yee,*
  887 F.3d 927 (9th Cir. 2018) ......................................................................... 29

*Haig v. Agee,*
  453 U.S. 280 (1981) ................................................................................18, 19, 23

*IRS v. Mathewson,*
  1993 WL 113434 (S.D.Fla. 1993) .................................................................. 25

*Kent v. Dulles,*
  357 U.S. 116 (1958) ................................................................................. *passim*

*Korematsu v. United States,*
  323 U.S. 214 (1944) ........................................................................................ 11

*Loving v. Virginia,*
  388 U.S. 1 ......................................................................................................... 20

*Malloy v. Hogan,*
  378 U.S. 1 (1964) ............................................................................................. 17

*McDonald v. City of Chicago,*
  561 U.S. 742 (2010) ............................................................................ 7, 8, 9, 18

*McKenzie et al v. Cowing,*
  4 Cranch CC 479, 16 F.Cas. 202 (U.S. 1834) ............................................... 25

*McQueary v. Laird,*
  449 F.2d 608 (10th Cir. 1971) ......................................................................... 4

*Oyama v. California,*
   332 U.S. 633 (1948) ........................................................................................10

*Rodriguez de Quijas v. Shearson/Am. Express, Inc.,*
   490 U.S. 477 (1989) .........................................................................................7

*Shuffler v. Heritage Bank,*
   720 F.2d 1141 (9th Cir. 1983) ....................................................................... 23

*The Slaughter-House Cases*
   83 U.S. 36 (1873) ................................................................................. *passim*

*Snyder v. Massachusetts,*
   291 U.S. 97 (1934) ..........................................................................................17

*Sojourner A. v. New Jersey Department of Human Services,*
   828 A.2d 306 (N.J. 2003) ............................................................................. 20

*Twining v. New Jersey,*
   211 U.S. 78 (1908) .............................................................................. 10, 13, 17

*United States v. Ballek,*
   170 F.3d 871 (9th Cir. 1999) ........................................................................ 28

*United States v. Barrett,*
   2014 WL 321141 (D.Colo. 2014) ......................................................... *passim*

*United States v. Garcia,*
   855 F.3d 615 (4th Cir. 2017) ....................................................................... 24

*United States v. Shaheen,*
   445 F.2d 6 (7th Cir. 1971) ................................................................... *passim*

*United States v. Wheeler,*
   254 U.S. 281 (1920) ...........................................................................8, 13, 16

*Way v. Tulsa East Child Support Services,*
   2017 WL 1036129 (N.D.Okla.) .....................................................................27

*Weinstein v. Albright,*
   261 F.3d 127 (2nd Cir. 2001) ..................................................................21, 27

*Ex parte Yarbrough,*
   110 U.S. 651 (1884) .......................................................................................13

*Zemel v. Rusk,*
    381 U.S. 1 (1965) ................................................................ 18, 19, 21

*Zschernig v. Miller,*
    389 U.S. 429 (1968) ...................................................................... 12


**Statutes**

6 U.S.C. § 201 *et seq.* .......................................................................... 12

8 U.S.C. § 1185(b) ................................................................................ 12

26 U.S.C. § 7345 ........................................................................ *passim*

26 U.S.C. § 7402(a) .................................................................. 24, 25, 26

28 U.S.C. § 1331 ..................................................................................... 4

28 U.S.C. § 1361 ..................................................................................... 4

28 U.S.C. §§ 2201 and 2202 ................................................................. 4

42 U.S.C. § 652(k) ........................................................................... 2, 27


**Other Authorities**

IRS collection manual, <u>https://www.irs.gov/irm/part5</u>; ................................... 24

Justice Department Tax Division collection manual,
    <u>https://www.justice.gov/tax/tax-division-judgement-collection-</u>
    <u>manual-4-collecting-judgment</u> ....................................................... 24

Plaintiff Jeffrey T. Maehr responds to the Government's motion to dismiss his amended complaint [Dkts. 46 and 32].

## I.    **SUMMARY**

Title 26 U.S.C. § 7345 revokes tax debtors' passports, and thus abridges their constitutional right to travel internationally, as a means of coercing them to pay their tax debts.  This passport revocation regime violates the Constitution's Article IV Section 2 Privileges and Immunities Clause, and substantive due process.  The Government may only revoke Mr. Maehr's passport for a compelling reason like national security or foreign policy.  At the very least, in this tax debt context, the Government may not revoke Mr. Maehr's passport unless and until it proves the predicates for obtaining a writ of *ne exeat*: that Mr. Maehr is trying to secrete assets abroad, or is refusing to repatriate assets that could pay his debt.

## II.    **RESPONSE TO THE GOVERNMENT'S BACKGROUND**

The Government's review of the legislative history of the tax-debt passport revocation regime confirms that the Government enacted it to coerce tax debtors to pay their debts.  *See* motion to dismiss [Dkt. 46] at 4 (proponents of the legislation reasoned that "tax compliance will increase if the issuance of a passport is linked to the payment of tax debts.")  Mr. Maehr agrees that depriving people of their constitutional rights can be a very effective way of motivating them to pay debts, or do anything else the Government wants them to do.  That is why the judicial branch guards constitutional rights against infringement and overreach by the executive and legislative branches.  That is why lawsuits like this one are necessary to maintain a free society.

The Government also touts various underlined procedural due process protections in this passport revocation regime, in an effort to make it appear constitutionally sound.

Motion to dismiss at pp. 5-8.  These protections are certainly an improvement over a prior passport revocation regime that Congress enacted to help collect child support debts, which generated litigation due to the absence of procedural mechanisms for challenging one's placement on the list.  *See* 42 U.S.C. § 652(k) (discussed below).  But, as the Government acknowledges and the Court appreciates, the procedural safeguards of 26 U.S.C. § 7345 are not at issue here.  This action assumes *arguendo* that Mr. Maehr has been properly certified and placed on the list of tax debtors whose passport may be revoked under the new regime, and maintains that revoking his passport and thereby depriving him of his right to travel internationally is still unconstitutional.  That is why Mr. Maehr has not sued the Commissioner of Internal Revenue in this action: he is not asking the Court to order the Commissioner of Internal Revenue to take him off the list; he is asking the Court to order the Secretary of State to reinstate his passport.

### III.      ARGUMENT

#### A.      Standard of review

The Government briefly discusses the now-familiar *Twombly/Iqbal* dismissal standard.  Motion to dismiss at 11-12.  While these cases are of course applicable to the Government's Rule 12(b)(6) motion, Mr. Maehr notes that his claims here do not implicate the "mere labels and conclusions" concern of *Twombly/Iqbal*.  The factual basis for Mr. Maehr's complaint is not deficient, vague or implausible – it is simple, straightforward and undisputed.  The Government revoked Mr. Maehr's passport (and thereby abridged his constitutional right to travel internationally) because he ostensibly owes the Government money.  Mr. Maehr maintains that the Government may not abridge his constitutional rights to coerce him to pay a debt – even if Congress says it can.

Mr. Maehr has styled this constitutional challenge as an as-applied challenge rather than a facial challenge because there may be some tax debtors whose passports can be legitimately revoked in the context of the Government's debt collection efforts: in particular, those that meet the criteria for passport revocation under prior *ne exeat* caselaw.  *See United States v. Shaheen*, 445 F.2d 6 (7th Cir. 1971) (conditioning issuance of a writ *ne exeat* and passport revocation on the government's establishment that tax debtor is attempting to secrete assets abroad or is refusing to repatriate assets); *United States v. Barrett*, 2014 WL 321141 (D.Colo. 2014) (reviewing evidence and holding that defendants' passports could be properly revoked for their tax debt under *ne exeat* principles).  Mr. Maehr acknowledges that the instant debt collection passport revocation regime is not necessarily unconstitutional in every instance, and that it might be saved through a limiting construction that applies the *ne exeat* predicates.  Mr. Maehr thus maintains that his challenge is properly characterized as an as-applied challenge rather than a facial challenge; and that as so framed, the Government may not defeat this challenge by imposing the high hurdles that apply to facial challenges, such as the requirement that the challenged law be unconstitutional in every instance.  *See*, *e.g.*, *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 328–29 (2006) (as-applied challenges are preferred over facial challenges, and limiting constructions are encouraged).  Nor should the Court get sidetracked or misled into a labelling exercise that ignores the easily-understood nature of Mr. Maehr's constitutional challenge.  *See Citizens United v. Federal Election Commission*, 558 U.S. 310, 331 (2010) (The "distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge.").

**B.    This Court has mandamus jurisdiction over the State Department and Secretary of State Pompeo.**

The Government next argues that this Court lacks jurisdiction because the Government enjoys sovereign immunity.  Not so.

The current amended complaint invokes federal question jurisdiction under 28 U.S.C. § 1331.  This Court also has jurisdiction under 28 U.S.C. §§ 2201 and 2202 (declaratory judgment and further relief).[1]

But the Government's sovereign immunity argument fails because this Court has mandamus jurisdiction over federal officers, employees and agencies under 28 U.S.C. § 1361.  This action is, at its core, a mandamus action: Mr. Maehr asks this Court to order the State Department and Secretary of State Mike Pompeo to reinstate his passport unless and until the Government proves *ne exeat* predicates as to him (which the Government has not suggested it can prove, and will not be able to).

It is well established that in an action against a federal officer or agency, "the doctrine of sovereign immunity does not apply if (1) the actions of the officers are beyond their statutory authority; and [*sic*, should be "or"] **(2) although acting within the scope of their authority, the powers exercised or the manner in which they are exercised are constitutionally void."**  *McQueary v. Laird*, 449 F.2d 608, 610 (10th Cir. 1971) (emphasis added) (affirming dismissal of suit against defense secretary to enjoin storage of chemical weapons at Rocky Mountain Arsenal), citing *Larson v. Domestic and Foreign Commerce Corp.*, 337 U.S. 682, 701-02 (1949) (establishing exception to sovereign immunity doctrine for lawsuits against federal

---

[1] Section 2201 exempts tax questions from declaratory relief, but this action does not ask the Court to determine any tax questions.

officers based on actions that are constitutionally void).  The State Department's act of revoking Mr. Maehr's passport, while statutorily authorized, was constitutionally void.

The Government cites a provision of the FAST Act's passport revocation regime that expressly authorizes lawsuits against the United States to challenge the Commissioner of Internal Revenue's certification of a taxpayer as having a seriously delinquent tax debt.  Motion to dismiss at 12-13, citing 26 U.S.C. § 7345(e).  As explained, Mr. Maehr is not challenging his placement on this list in this action; but rather the revocation of his passport.

The Government also cites a related provision of the FAST Act that is codified in the State Department's Title 22, which effectively states that a taxpayer who seeks to challenge his certification should sue the Commissioner of Internal Revenue and not the Secretary of State, since the latter officer is just doing his job when he revokes the passports of people on the list certified by the Commissioner.  *Id.*, citing 22 U.S.C. § 2714a(e).  Again, this provision would be relevant if Mr. Maehr were suing to challenge being put on the list, but that is not what this action is about.  The premise of this action is that even if Mr. Maehr has been properly certified as owing a seriously delinquent tax debt, the Secretary of State may not revoke his passport for that reason – even though Congress has directed the Secretary to do so in 26 U.S.C. § 7345.

This action is thus properly framed and captioned.  It is an action against the State Department and Secretary of State Mike Pompeo in his official capacity, asking for relief in the nature of mandamus: reinstatement of Mr. Maehr's passport.  This requested mandamus relief is warranted by the unconstitutionality of the FAST Act's passport revocation regime, codified primarily in 26 U.S.C. § 7345, but also elsewhere. The Government has responded to the challenge.  This Court has jurisdiction to decide

it.  Should the Court determine that it is important for the caption to name the "United States" as a defendant, in addition to or in lieu of the Department of State and Secretary of State Pompeo, Mr. Maehr has no objection to the caption being so modified.

**C.     The passport revocation regime is unconstitutional under the Supreme Court's existing privileges and immunities jurisprudence.**

The Government seeks dismissal because the right of international travel, while of constitutional dimension, has supposedly not been characterized as a "fundamental right" under the Supreme Court's substantive due process jurisprudence.  The Government therefore reasons that the right can be qualified or abridged for any legitimate reason, including the Government's desire to raise revenue by coercing payment of tax debts.

The Government's legal arguments are wrong – as discussed below, the instant passport revocation regime does indeed violate substantive due process.  But there is another sound doctrinal basis for finding this passport revocation regime to be unconstitutional: it violates the Constitution's Article IV Section 2 Privileges and Immunities Clause.  Mr. Maehr addresses privileges and immunities first because the doctrine is narrower.  This is not a matter of constitutional avoidance, since both privileges and immunities and substantive due process are constitutional doctrines.  It is rather a matter of using the less sweeping constitutional doctrine able to do the job. Before the Court hauls out the heavy artillery of substantive due process, it should first determine if the passport revocation regime can be dispatched by a single shot from the antique but still functional rifle of privileges and immunities jurisprudence.

**1.     Privileges and immunities jurisprudence applies here.**

It is not surprising that the Government does not address the right of international travel under the Supreme Court's privileges and immunities

-6-

jurisprudence.  That entire civil rights jurisprudence is widely regarded as having become a dead letter after the *Slaughter-House Cases*, 83 U.S. 36 (1873), and their progeny limited the scope of the Constitution's Privileges and Immunities Clauses to a few specific civil rights stemming from national rather than state citizenship.  Indeed, the evisceration of privileges and immunities protections through the *Slaughter-House Cases* is the reason the Supreme Court developed its current doctrine of substantive due process.  *See McDonald v. City of Chicago,* 561 U.S. 742, 754-66 (2010) (majority analysis); *id* at 805-58 (Thomas, J. concurring, developing privileges and immunities history and jurisprudence, and urging Court to abandon substantive due process theory, overrule the wrongly decided *Slaughter-House Cases*, and reground civil rights law in the Privileges and Immunities Clauses).

But the Supreme Court's existing privilege and immunities civil rights jurisprudence, even as limited by the *Slaughter-House Cases*, fits perfectly here.  And even though this law is old and has fallen into disuse, it is still authoritative and controlling.  *See Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, [lower courts] should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.").  Because the constitutional right to international travel is plainly an aspect of federal rather than state citizenship, Congress's abridgment of that right through its passport revocation regime runs afoul of the Article IV Section 2 Privilege and Immunities Clause.

### 2.    Status of civil rights protections under the Privileges and Immunities Clauses

Article IV Section 2 of the Constitution states:

> The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States.

As Justice Thomas explains in his erudite concurrence in *McDonald*, the term "privileges and immunities" means what we now call civil rights.  561 U.S. 813-20 (quoting *Corfield v. Coryell*, 6 F. Cas. 546, 551-52 (CC ED Pa. 1825)).  *See also United States v. Wheeler*, 254 U.S. 281, 294-97 (1920) (enumerating the civil rights encompassed within the term "privileges and immunities" as including rights to travel, hold property, access the courts, and non-discriminatory treatment).

In *McDonald*, the Supreme Court thoroughly reviewed the development of civil rights jurisprudence under the Privileges and Immunities Clauses, including the limitations imposed by the *Slaughter-House Cases* and the resulting advent of substantive due process.  A brief summary is warranted here, since the doctrine has so rarely been invoked following its functional replacement by substantive due process.

The Article IV Section 2 Privileges and Immunities Clause recognizes and protects the civil rights of all citizens of the United States.  561 U.S. at 754, 807-08.[2]  The Supreme Court ruled in *Dred Scott* that African-Americans were not citizens of any state or the United States, and hence had no legally cognizable civil rights.  The Civil War Amendments, including the Fourteenth Amendment with its Privileges and Immunities Clause ("No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States") were adopted to overrule *Dred Scott.  Id.*

As Justice Thomas argues in his *McDonald* concurrence, and the *McDonald* majority effectively acknowledges, the original purpose and intent of the Fourteenth

---

[2] Citations here are to the *McDonald* majority, and Justice Thomas's concurrence, respectively.

Amendment's Privilege and Immunities Clause was to secure and protect civil rights for all citizens (including African-Americans) against deprivation by the states. 561 U.S. at 754-55, 808. That is, the Fourteenth Amendment's Privileges and Immunities Clause was intended to federalize civil rights protections generally.

But this intent was confounded by the deliberately narrow reading of Privileges and Immunities Clauses adopted by the Supreme Court in the *Slaughter-House Cases*, which defined "the relevant collection of rights quite narrowly." *Id.* The *Slaughter-House* Court did this by drawing a "sharp distinction between the privileges and immunities of state citizenship and those of federal citizenship, and [holding] that the Privileges or Immunities Clause protected only the latter category of rights from state abridgment." *Id.*; *Slaughter-House Cases*, 83 U.S. at 73-74.

Justice Thomas's *McDonald* concurrence urged the Court to overrule the *Slaughter-House Cases* and reground civil rights jurisprudence in the more textually-sound privileges and immunities jurisprudence, as it was originally intended to operate. *Id.* at 808-58. The *McDonald* majority declined this invitation, choosing instead to leave privilege and immunities jurisprudence where it was, and address the individual right to bear arms under the established framework of substantive due process jurisprudence that arose in the wake of the *Slaughter-House Cases* and their progeny. *Id.* at 759-67. *McDonald* thus did not reverse or limit the civil rights jurisprudence under the Privileges and Immunities Clauses as it had been developed by Court's century-old caselaw, or otherwise limit its application to other civil rights.

This old and largely ignored caselaw is perfectly apposite here because the right to international travel is a right arising from federal rather than state citizenship under the *Slaughter-House* paradigm.

-9-

The scope of civil rights protections afforded by privileges and immunities clauses is best summarized in one of the last of the *Slaughter-House Cases*' progeny, *Twining v. New Jersey*, 211 U.S. 78 (1908).  There, in the course of holding that the Fifth Amendment right against self-incrimination did not apply to the states, the Supreme Court undertook a thorough and frank review of how it had deliberately limited civil rights protections in the *Slaughter-House Cases*.  211 U.S. at 94-96.  The *Twining* Court then enumerated the few privileges and immunities stemming from "National citizenship" that the Court had recognized so far:

> **[A]mong** the rights and privileges of National citizenship recognized by this court are the right to pass freely from State to State; the right to petition Congress for a redress of grievances; the right to vote for National officers; the right to enter the public lands; the right to be protected against violence while in the lawful custody of a United States marshal; and the right to inform the United States authorities of violation of its laws.

*Id.* at 97 (cleaned up, emphasis added, citations omitted).

Per the emphasized word "among," *Twining*'s list of civil rights protected by the Privileges and Immunities Clauses did not purport to be exhaustive.  Nor was it.  The *Twining* Court forgot to include the recognized right to participate in interstate commerce.  *Crutcher v. Commonwealth*, 141 U.S. 47, 57 (1891) ("To carry on interstate commerce is not a franchise or a privilege granted by the state; it is a right which every citizen of the United States is entitled to exercise under the constitution and laws of the United States....").  And at least one later case has invoked the limited privileges and immunities analysis of *Slaughter-House Cases* to recognize another civil right secured by the federal constitution, but not mentioned in *Twining*.  *See Oyama v. California*, 332 U.S. 633, 640 (1948) (holding that the right to own real property is a federal privilege and immunity, rendering unconstitutional a California statute that prohibited

the citizen son of a Japanese non-citizen from owning property).[3]

Thus, the list of constitutional rights that stem from national rather than state citizenship may be relatively small, but those rights have never been exhaustively enumerated.  New rights can be recognized in this category.

### 3. The constitutional right of international travel is protected from congressional abridgment under the Article IV Section 2 Privileges and Immunities Clause.

The right to travel internationally has been recognized as a right of constitutional dimension:

> The right to travel is a part of the "liberty" of which the citizen cannot be deprived without due process of law under the Fifth Amendment. . . . Freedom of movement across frontiers in either direction, and inside frontiers as well, was a part of our heritage. **Travel abroad**, like travel within the country, . . . may be as close to the heart of the individual as the choice of what he eats, or wears, or reads. Freedom of movement is basic in our scheme of values.

*Kent v. Dulles*, 357 U.S. 116, 125-26 (1958) (emphasis added).  *See also Aptheker v. Secretary of State*, 378 U.S. 500, 517 (1964) (the right to international travel is "a constitutional liberty closely related to rights of free speech and association"); *United States v. Shaheen*, 445 F.2d 6, 10 (7th Cir. 1971) (right of international travel is a "constitutionally protected personal liberty"); *United States v. Barrett*, 2014 WL 321141 *7 (D.Colo. 2014) ("Because the writ restrains the Barretts' constitutional right to travel,

---

[3] *Oyama*'s reliance on *Slaughter-House* privileges and immunities jurisprudence might be explained by the fact that the doctrine of substantive due process was still developing, and the Court was hesitant to deploy it to protect the rights of Japanese citizens and non-citizens shortly after World War II.  *Cf. Korematsu v. United States*, 323 U.S. 214 (1944).

the government bears a heavy burden to show exceptional circumstances warranting such relief.").[4]

Under a privileges and immunities analysis, the next question is whether this constitutional right to travel internationally stems from federal or state citizenship. While the *Slaughter-House Cases* deliberately created this distinction to limit the scope of federal civil rights protections (since the states are the sovereigns of general jurisdiction and the federal government is limited in its scope), the right to international travel plainly stems from federal rather than state citizenship. *E.g. Zschernig v. Miller*, 389 U.S. 429, 441 (1968) (states have no authority to regulate international travel); 8 U.S.C. § 1185(b) (federal law requiring citizens to have a valid U.S. passport, issued by the State Department, to enter or exit the country); 6 U.S.C. § 201 *et seq.* (giving control of travel in and out of the country to the new federal Department of Homeland Security and its Transportation Security Administration).

Since few cases were decided under the *Slaughter-House* paradigm, there is no direct precedent confirming that Congress may not abridge the constitutional right to travel internationally under the Article IV Section 2 Privileges and Immunities Clause. But what precedent there is confirms that Congress's new passport revocation regime in 26 U.S.C. § 7345 is unconstitutional on this basis.

Most of the post-*Slaughter-House* decisions address civil rights violations by

---

[4] *Kent* and *Aptheker* reversed passport revocations for communists. *Shaheen* and *Barrett* are tax collection cases applying the *ne exeat* doctrine, holding that the Government may not restrict a tax debtor's right to travel internationally without proving that the debtor is trying to secrete assets abroad or refusing to repatriate assets. These cases are discussed in the substantive due process section below.

KKK members, sometimes excusing them and sometimes affirming their convictions or rejecting their habeas petitions.  *See Twining*, 211 U.S. at 98, discussing, *inter alia*, *Ex parte Yarbrough*, 110 U.S. 651 (1884) (rejecting habeas petitions from a group of Georgia Klansmen (including the exquisitely-named Dilmus Yarbrough, Bold Emory, and State Lemmons) who were convicted of violently preventing African-Americans from voting for national officers).  But one case cited by *Twining* as construing privileges and immunities per the *Slaughter-House* paradigm specifically addresses the right to travel: *Crandall v. Nevada*, 73 U.S. 35 (1868).  *See Twining*, 211 U.S. at 97 ("[A]mong the rights and privileges of National citizenship recognized by this court are the right to pass freely from State to State..."), citing *Crandall*.

In *Crandall*, the Court struck down a Nevada statute imposing a head tax on persons leaving the state by recognizing a constitutional right of interstate travel.  73 U.S. at 43-45.  The Court did not expressly locate the source of this constitutional right; but it characterized the right to leave a state as a "privilege," 73 U.S. at 40, effectively grounding the right in the Article IV Section 2 Privileges and Immunities Clause – a view later confirmed by *Wheeler*, 254 U.S. at 293, and *Edwards v. California,* 314 U.S. 160, 178 (1941).  Having identified the right to travel as a federally-protected constitutional right, the *Crandall* Court did not further consider whether the right to travel was a "fundamental" right; or engage in any balancing tests, weighing the right to travel freely against Nevada's interest in raising tax revenue.  The Court simply struck down Nevada's law taxing travel over its borders as "inconsistent" with the constitutional right of interstate travel.  73 U.S. at 49.

This is not to say that all rights protected by the privileges and immunities paradigm are inviolable and never subject to any sort of balancing of interests.  As

-13-

discussed below, the federal government may have compelling national security or foreign policy interests that outweigh an individual's right to travel internationally as he pleases. *Crandall* simply confirms that a government's legitimate but mundane interest in raising revenue is not the sort of interest that can outweigh a constitutionally protected right under the privileges and immunities paradigm.

The *Slaughter-House* privileges and immunities paradigm and holding of *Crandall* require this Court to similarly strike down Congress's new passport revocation regime for delinquent tax debtors in 26 U.S.C. § 7345. Because the right to travel internationally is a right grounded in federal citizenship, it comes within the ambit of the privileges and immunities protections articulated by the *Slaughter-House Cases* and their progeny. The purpose of the new statutory regime (as acknowledged by the Government in its motion to dismiss) is to raise revenue: a plainly legitimate interest, and the same interest that Nevada was pursuing with its head tax on people crossing its borders. But *Slaughter-House* and *Crandall* confirm that a government (state or federal) may not raise revenue by abridging citizens' rights that are protected by the federal constitution, including the right to travel internationally.

Thus, without wheeling out the heavy artillery of substantive due process, the Court must conclude that the Government's argument for dismissing Mr. Maehr's action for passport reinstatement fails. The Article IV Section 2 Privileges and Immunities Clause prevents Congress from abridging federally protected constitutional rights generally, and the right to travel specifically, as a means of coercing citizens to pay money to the government. *Slaughter-House Cases*, *supra*; *Crandall*, *supra*.

**D.     The passport revocation regime violates substantive due process.**

While privileges and immunities provides a sound and sufficient basis for striking

-14-

down 26 U.S.C. § 7345 as an unconstitutional abridgment of the right to international travel, the same result can and should be reached through traditional modern substantive due process analysis.  This Court should address both doctrines now to avoid any need for remand as this case undergoes appellate review.

The Government's position is that while the right of <u>interstate</u> travel is a fundamental right, the right of <u>international</u> travel is not fundamental, and can therefore be regulated under a rational basis analysis in which any legitimate government interest can justify restriction or complete abridgment of the right.  The Government argues that its interest in raising revenue, by coercing seriously delinquent tax debtors to pay their debts, is a legitimate interest that justifies abridging tax debtors' constitutional right to international travel.

The Government's position is wrong as a matter of law on all counts.

### 1.    The right to travel internationally is a fundamental right.

There are no Supreme Court decisions directly addressing whether the Government can restrict or abridge a person's right to travel internationally as a means of coercing that person to pay a debt.  Nor are there any Supreme Court decisions that directly address whether the Government can restrict or abridge the right of international travel for a less than compelling reason.  The Government <u>infers</u> its rational basis framework from dicta in some Supreme Court cases, as interpreted by other lower federal courts but not the Tenth Circuit.  Motion to dismiss at 13-15.  These lower court decisions may be considered for their persuasive value, but they are not binding.  The language and holdings of the relevant Supreme Court cases are binding, and control this Court's analysis.  Those cases must be read closely.

Early Supreme Court decisions did not delve into the right of international travel

specifically, but held that the right to travel generally is a "fundamental" right.  *E.g.*

*United States v. Wheeler*, 254 U.S. at 293 (despite "fundamental" right to peacefully

dwell within a state, and "to have free ingress thereto and egress therefrom," holding

that federal criminal charges against mining company executives who kidnapped

workers to break a strike were properly dismissed because there was no federal law

prohibiting kidnapping, and no state action was involved).

  The first cases addressing the specific right to travel internationally arose in the

1950s and 1960s, during the Red Scare.  In the seminal case of *Kent v. Dulles*, 357 U.S.

116 (1958), the Supreme Court held that the Secretary of State could not deny citizens'

passports and thereby restrict their right of international travel because they were

communists.  The Court thoroughly reviewed the history of how the United States had

restricted international travel in times of war, and also how the ability to travel

internationally gradually became dependent on a passport issued exclusively by the

Secretary of State.  357 U.S. at 120-25.  The Court then addressed the historical

importance of the right to freedom of movement, including the rights of both interstate

and international travel:

> The right to travel is a part of the "liberty" of which the citizen cannot be
> deprived without due process of law under the Fifth Amendment.... **In
> Anglo-Saxon law, that right was emerging at least as early as the
> Magna Carta.** [Footnote 12]

*Id*. at 125 (emphasis added).  In the footnote, the Court quoted article 42 of the Magna

Carta:

> It shall be lawful to any person, for the future, to go out of our kingdom,
> and to return, safely and securely, by land or by water, saving his
> allegiance to us, unless it be in time of war, for some short space, for the
> common good of the kingdom: excepting prisoners and outlaws, according
> to the laws of the land, and of the people of the nation at war against us,
> and Merchants who shall be treated as it is said above.

69141464.3

*Id.* at 125, n.12.

This reference to and quotation of the Magna Carta is significant, and (properly understood) controls this Court's analysis.  Invoking the Magna Carta and other comparable documents of the rights of free Englishmen from before the adoption of the Constitution has long been the primary way that the Supreme Court identifies a particular right as an aspect of the "law of the land" which pre-existed and was imported into our constitutional scheme of governance, and hence receives maximum protection under the doctrine of substantive due process.  For example, in the course of holding that the right against compulsory self-incrimination was not protected by the then-emerging notion of substantive due process, the Court in *Twining v. New Jersey* described the rights protected by substantive due process as those rights established as "law of the land" in such great documents as the Magna Carta (1215), the Petition of Right (1628), and the Bill of Rights (1689).  *Twining*, 211 U.S. at 100-108.[5]  As the Supreme Court further developed the theory and language of substantive due process, it continued to ground the concept in "principle[s] of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental."  *Snyder v. Massachusetts*, 291 U.S. 97, 105 (1934) (citing *Twining* and other cases).  This phrase has remained the touchstone of modern substantive due process theory.  *See, e.g.*, *McDonald*, 561 U.S. at 760 (discussing the lexicon of substantive due process).

---

[5] *Twining*'s holding that the Fifth Amendment right against self-incrimination did not apply to state courts was eventually reversed in *Malloy v. Hogan*, 378 U.S. 1 (1964).  However, *Twining* has been praised as "one of the outstanding opinions in the history of the Court" for the depth of its legal and historical analysis.  *Adamson v. California*, 332 U.S. 46, 59 (1947) (Frankfurter, J., concurring).

As a result, when the Supreme Court in *Kent* traced the right of international travel back to the 1215 Magna Carta, it effectively described the right as fundamental and therefore subject to the maximum protections afforded by substantive due process. This status is confirmed by other language from *Kent*, discussing how the right of international travel is "**deeply engrained in our history**":

> Freedom of movement across frontiers in either direction, and inside frontiers as well, was a part of our heritage. **Travel abroad, like travel within the country,** may be necessary for a livelihood. It may be as close to the heart of the individual as the choice of what he eats, or wears, or reads. Freedom of movement is basic in our scheme of values.

357 U.S. at 126 (emphases added).  Based on this description of the right of international travel, the Supreme Court held that the Secretary of State could not refuse to issue passports to communists because they were communists.  *Id.* at 126-30.[6]

The Court repeated this analysis in *Aptheker v. Secretary of State*, 378 U.S. 500, 501 (1964), striking down a provision of the Subversive Activities Control Act which denied passports to communists.

Following these two decisions which described the right to international travel as fundamental and enjoying the maximum protections of substantive due process, the Supreme Court decided two cases which presented truly compelling government interests that justified restricting the right.  In *Zemel v. Rusk*, 381 U.S. 1 (1965), the Court affirmed the Secretary of State's ability to restrict travel to Cuba as a matter of

---

[6] While the *Kent* majority mentioned "beliefs and associations" of the communists in its analysis, it did not mention their First Amendment rights at all.  The First Amendment is not mentioned in the majority opinion.  Perhaps now courts would have no problem recognizing a First Amendment political right to practice and advocate communist principles, but this was 1958.  The *Kent* majority grounded its holding in the communists' fundamental right to travel internationally.

foreign policy and national security.  Then in *Haig v. Agee*, 453 U.S. 280 (1981), the Court affirmed the Secretary's revocation of an ex-CIA agent's passport due to national security concerns, because the agent intended to expose undercover CIA officers in his travels.  Both *Zemel* and *Agee* are perfectly consistent with treating the right of international travel as a fundamental right enjoying the fullest substantive due process protection, as previously recognized in *Kent* based on the right's lineage from the Magna Carta.  In fact, *Zemel* treats the rights of interstate and international travel equally, requiring the Government to have sufficiently good cause (*i.e.* a truly compelling interest) to restrict either of them.  381 U.S. at 15-16.  The Government could restrict international travel rights in *Zemel* and *Agee* because national security and foreign policy are quintessentially compelling governmental interests.

In between *Zemel* and *Agee*, the Court decided *Califano v. Aznavorian*, 439 U.S. 170 (1978), where it upheld a provision of the Social Security Act that halted monthly payments of Supplemental Security Income (SSI) to recipients who are outside the United States for the entire month.   The Court upheld the SSI provision not because the right of international travel was less than fundamental, but rather because there is no right to receive government welfare or benefit payments in a manner that is perfectly free of any "incidental" impact on other constitutional rights:

> [T]his case involves legislation providing **governmental payments of monetary benefits that has an incidental effect on a protected liberty**, similar to the legislation considered in *Califano v. Jobst, supra*. There, another section of the Social Security Act was challenged because it "penalized" some beneficiaries upon their marriage. The Court [acknowledged the impact on the fundamental right to marry] but nonetheless upheld the constitutional validity of the challenged legislation.
>
> The statutory provision in issue here does not have nearly so direct an impact on the freedom to travel internationally as occurred in the *Kent*, *Aptheker*, or *Zemel* cases. **It does not limit the availability or validity of passports.**

-19-

*Id.* at 177 (emphases added), citing *Califano v. Jobst*, 434 U.S. 47 (1977) (upholding Social Security Act provision terminating government disability benefits upon marriage).  The *Aznavorian* Court's reliance on *Jobst* confirms that its holding is fully consistent with the right of international travel being a fundamental right, since marriage is also a fundamental right for substantive due process purposes and was similarly impacted by a Social Security benefit regulation.  *Jobst*, 434 U.S. at 54 and n.10, citing *Loving v. Virginia*, 388 U.S. 1.[7]  *Aznavorian* also noted how the welfare regulation before the Court did not limit anyone's right to travel internationally, *e.g.* by revoking their passport.  *Aznavorian* is thus perfectly consistent with *Kent*'s prior holding that the right of international travel is a fundamental right for substantive due process purposes.

However, in the course of its decision, the *Aznavorian* Court distinguished the right to international travel from the right of interstate travel in the following langauge:

> The constitutional right of interstate travel is virtually unqualified.  By contrast, the right of international travel has been considered to be no more than an aspect of the liberty protected by the Due Process Clause of the Fifth Amendment. As such, this right, the Court has held, can be regulated within the bounds of due process.

---

[7] The same legal analysis has been employed to uphold "family cap" provisions of welfare laws that ended the prior system of increasing welfare payments based on the recipient's number of children, even though procreative rights are deemed fundamental. *See*, *e.g*., *C.K. v. Shalala*, 883 F.Supp. 991, 1014-15 (D.N.J. 1995) (government may not restrict welfare recipients' procreative choices, but it has no constitutional obligation to automatically subsidize them through a welfare program), *aff'd* 92 F.3d 171, 195 (3d Cir. 1996); *Sojourner A. v. New Jersey Department of Human Services*, 828 A.2d 306, 314-17 (N.J. 2003) (reaching same result under the due process provisions of the New Jersey Constitution).

439 U.S. at 176.   This language was quoted in *Haig v. Agee*, and has become the basis for several lower federal court decisions (none from the Tenth Circuit) treating the right of international travel as a non-fundamental right that can be restricted under a rational basis analysis.  *See* motion to dismiss at 13-14.  This language, however, is dicta, since *Aznavorian*'s holding is grounded not on the relative importance of the constitutional right of international travel, but on Government's entitlement to structure welfare programs in a way that might have some incidental impact on even fundamental constitutional rights such as marriage, procreation, and travel.  While dicta from the Supreme Court may be treated as binding by lower federal courts, this particular dictum conflicts with the holdings of *Kent* and *Zemel* that the right to travel internationally is a fundamental right.  The *Aznavorian* Court distinguished *Kent* but did not reverse it.  As a result, the *Aznavorian* dictum yields to the holding in *Kent*.

Thus, when read in full and properly understood, *Aznavorian* did not demote the right of international travel from the fundamental status recognized in *Kent* and *Zemel*. Rather, lower federal court decisions have misread the controlling Supreme Court caselaw to wrongly demote the right of international travel to less than fundamental status.  *E.g. Weinstein v. Albright*, 261 F.3d 127, 140 (2nd Cir. 2001) (affirming constitutionality of prior passport revocation regime for child support debtors because the right of international travel was supposedly not a fundamental right).

Indeed, the confusion wrought by the stray dictum in *Aznavorian* resulted in three opinions by a three-judge panel in *Eunique v. Powell*, 302 F.3d 971 (9th Cir. 2002), the most detailed circuit-level case on the prior child support passport revocation regime.  There, one judge applied a rational basis standard to affirm the passport revocation regime.  A concurring judge applied an intermediate scrutiny analysis, but

agreed that passport revocation was justified for child support debts.  The dissenting judge would have treated the right of international travel as fundamental and struck down the passport revocation regime.  The differing analyses of the three opinions in *Eunique* can be reconciled through the above close reading and analysis of the Supreme Court cases.  *Eunique*'s lead and concurring opinions erroneously concluded that the Supreme Court has never held that the right of international travel is a fundamental right – it did so in *Kent*, by grounding it in the Magna Carta and other express language. *Eunique*, *Weinstein* and similar lower federal court decisions applying rational basis review to abridgements of the right of international travel are wrong.  Ninth Circuit Judge Kleinfeld got the analysis right in his erudite *Eunique* dissent, which would limit passport revocation to truly compelling reasons like national security and foreign policy. 302 F.3d at 979-85.  Judge Kleinfeld's dissent even presciently predicted the instant passport revocation regime for tax debts as the next logical step if the child support revocation regime were upheld:

> [The right of international travel] is too important to let the government take it away as punishment to advance a government policy just because it is important. **You can't get a passport if you're in arrears on your taxes?** If you were ever convicted of drunk driving? If you didn't obey a summons for jury service? That weighs our liberty too lightly.

*Id*. at 985 (emphasis added).[8]

---

[8] Indeed, if the Government's position prevails here, then why should it stop at denying debtors their constitutional right to international travel?  Congress's next logical and legally permissible step would be to enact a statute eliminating tax debtors' Fourth Amendment rights until they pay up, and authorizing IRS revenue agents to conduct warrantless searches of debtors' homes for money and valuables to seize to satisfy or reduce their tax debts.  Taking the Government's position to its logical conclusion, the Government could supercharge its debt collection efforts by torturing tax debtors until they pay up.  The constitutional right not to be tortured by the

*(Footnote cont'd on next page)*

Because the right to travel internationally is a fundamental right, Congress and the executive branch may revoke passports for compelling reasons like national security and foreign policy, but not for the mundane purpose of raising revenue by coercing debtors to pay debts.  The Government can collect tax debts using the extensive legal means at its disposal, such as execution, garnishment, and setoff against other government benefits.

> **2.** **Even if international travel is not a fundamental right, the passport revocation regime still violates due process unless limited by *ne exeat* principles.**

Even under the *Aznavorian* dictum repeated in *Haig v. Agee*, which underlies the Government's position, the constitutional right of international travel must still be "regulated <u>within the bounds of due process</u>."  *Aznavorian*, 439 U.S. at 176 (emphasis added).  The Government argues that this language permits a rational basis analysis in which any legitimate reason, such as collecting debts, provides sufficient grounds to revoke a passport.  Motion to dismiss at 13-15.  The Government is wrong.  The Government encroaches the "bounds of due process" when it collects debts by abridging debtors' constitutional rights as a means of coercing payment.  This is because the established Anglo-American common law traditions that animate due process do not permit courts to use their extraordinary equitable powers, such as contempt, to coerce

---

*(Footnote cont'd from previous page.)*

Government has long been recognized.  *See*, *e.g.*, *Brown v. Mississippi*, 297 U.S. 278 (1936).  But if, as the Government contends, the Government's interest in collecting debts is a good enough reason to justify deprivation of constitutional rights, Congress could authorize the IRS to arm its revenue agents with thumbscrews.  That would no doubt garner the "compliance" the Government seeks.  *See* motion to dismiss at 4 (citing legislative history of how Congress sought to increase "tax compliance" by revoking tax debtors' passports).

debtors to pay ordinary debts.

In our common law tradition, creditors can collect money judgments through legal means, such as execution and garnishment.  Courts do not enforce money judgments by holding the debtor in contempt for non-payment, and imprisoning the debtor until he pays up.  *See*, *e.g.*, *Shuffler v. Heritage Bank*, 720 F.2d 1141, 1147 (9th Cir. 1983) ("The proper means for [a party] to secure compliance with a money judgment is to seek a writ of execution, not to obtain a fine of contempt for the period of nonpayment."); *Ecopetrol S.A. v. Offshore Expl. & Prod. LLC*, 172 F.Supp.3d 691, 698 (S.D.N.Y. 2016) ("[C]ontempt power should not be used to enforce a money judgment....").[9]  The Department of Justice and the IRS have developed detailed manuals for collecting tax debts which provide numerous legal avenues and techniques for debt collection, but do not instruct government collection lawyers to ask courts to hold debtors in contempt and imprison them to coerce payment.[10]  The passport revocation regime violates this basic principle of Anglo-American law, and thus substantive due process, because it seeks to compel payment through similar coercion.

This is the conclusion reached in the *ne exeat* tax debt cases, which are precisely on point.  Before the enactment of 26 U.S.C. § 7345, the Government could and did (and

---

[9] Because this is a core common law principle, state authority is naturally similar. *E.g. In re Byrom*, 316 S.W.3d 787, 791 (Tex.App. 2010) ("An order requiring payment of a debt may be enforced through legal processes like execution or attachment, but not by the imprisonment of the adjudicated debtor."); *Carter v. Grace Whitney Properties*, 939 N.E.2d 630, 635 (Ind.App. 2010) (same).

[10] https://www.justice.gov/tax/tax-division-judgement-collection-manual-4-collecting-judgment and https://www.irs.gov/irm/part5; *see United States v. Garcia*, 855 F.3d 615, 621-22 (4th Cir. 2017) (courts may "take judicial notice of information contained on state and federal government websites.").

still can) revoke tax debtors' passports to collect tax debts pursuant to 26 U.S.C.

§ 7402(a), which authorizes federal courts to issue writs of *ne exeat republica* to aid the

Government's collection efforts.  *Ne exeat* is an ancient common law writ that courts

may use to prevent a defendant or judgment debtor from frustrating the collection of a

money judgment by leaving the court's jurisdiction with their property.  *Atherton v.*

*Gopin*,  355 P.3d 804, 808-09 (N.M.App. 2015) (reviewing history of *ne exeat*, collecting

cases and authorities).  "Because the writ of *ne exeat* operates in restraint of personal

liberty, it is to be granted with caution and continued in force with caution."  *Id.* at 809

(cleaned up), quoting *Cohen v. Cohen*, 64 N.E.2d 689, 693 (Mass. 1946).  As particularly

relevant here:

> **In the absence of a threat to abscond**, <u>**the writ may not be used**</u>
> <u>**as a form of coercing payment of a debt**</u>, **no matter how just**, nor
> as a form of punishment, no matter how deserved.

*Atherton*,  355 P.3d at 809, quoting *Tedards v. Auty*, 557 A.2d 1030, 1034 (N.J.App.

1989) (cleaned up, emphasis added).  *Accord Aetna Cas. & Sur. Co. v. Markarian*, 114

F.3d 346, 349 (1st Cir. 1997) (reversing writ of *ne exeat* issued in a non-tax judgment

collection proceeding, noting that the ancient writ "hearkens back to the days when

debtors were imprisoned for failure to pay their debts. The writ is itself a form of civil

arrest.").

    This ancient common law rule has been authoritatively recognized by the

Supreme Court.  *McKenzie et al v. Cowing*, 4 Cranch CC 479, 16 F.Cas. 202, 203 (U.S.

1834) (courts may not use writ of *ne exeat* to compel payment of a debt; creditor must

pursue ordinary legal remedies and collection methods).

    Federal courts have applied these common law principles in the precise situation

at bar: determining whether the Government may revoke a tax debtor's passport under

26 U.S.C. § 7402(a), as a means of collecting a tax debt.  *See United States v. Shaheen*, 445 F.2d 6 (7th Cir. 1971); *IRS v. Mathewson,* 1993 WL 113434 (S.D.Fla. 1993); *United States v. Barrett*, 2014 WL 321141 (D.Colo. 2014).

In the leading decision of *Shaheen* (written by the late Justice Stevens when he was on the Seventh Circuit), the court discussed how the common law writ of *ne exeat* could be used to by the Government "to compel a citizen to pay his taxes" by revoking the citizen's passport and thereby preventing him from leaving the country.  445 F.2d at 9-10.  But because the right of international travel is a constitutional right, per *Kent* and *Aptheker*, the Government may not obtain a writ of *ne exeat* as a matter of course, but only where it can establish traditional *ne exeat* predicates: that the tax debtor is attempting to leave the country with his assets, or has done so and refuses to repatriate those assets.  *Id.* at 10-11.

In *Barrett*, this Court followed *Shaheen* by requiring the Government to establish *ne exeat* predicates to justify revoking the defendant tax debtors' passports.  *Barrett,* 2014 WL 321141 at *7 ("Because the writ restrains the Barretts' constitutional right to travel, the government bears a heavy burden to show exceptional circumstances warranting such relief.").  There, Judge Jackson held that *ne exeat* was warranted by the Government's extensive and detailed evidence that the Barretts had relocated and moved their assets to Ecuador, and owned property of non-trivial value in Ecuador that they could repatriate to pay their tax debt.  *Id.* at 7-9.

These *ne exeat* cases establish precisely how the constitutional right to international travel may be "regulated within the bounds of due process," per the *Aznavorian* dictum.  The two passport revocation regimes of 26 U.S.C. §§ 7402(a) and 7345 are functionally identical in that they both apply to collecting tax debts, and both

coerce payment by revoking tax debtors' passports to prevent them from leaving the country.  The prior *ne exeat* cases balance the Government's interest in collecting debts through this coercive method with the substantive due process rights of tax debtors, and conclude that the Government can revoke a tax debtor's passport and abridge his constitutional right to travel internationally only if the Government can establish a traditional *ne exeat* predicate: that the debtor is attempting to secrete assets abroad, or refusing to repatriate assets that can be used to pay the tax debt.  Indeed, the language in *Kent v. Dulles*, 357 U.S. at 127, that the Government may revoke the passports of those "trying to escape the toils of the law" perfectly captures this later *ne exeat* analysis: our common law traditions, and hence substantive due process, permit the Government to revoke passports of those who try to avoid debt collection by secreting assets abroad; not those who merely owe debts.

Because the Government has not established *ne exeat* predicates as to Mr. Maehr (and will not be able to, as Mr. Maehr will show at summary judgment), the Secretary of State may not revoke his passport under 26 U.S.C. § 7345.  The passport revocation regime is unconstitutional as applied to him.

### 3. The prior passport revocation regime to collect child support is distinguishable – children's lives and welfare depend on child support.

The Government argues that the Court should nonetheless dismiss Mr. Maehr's constitutional challenge because lower federal courts (outside the Tenth Circuit) have upheld the constitutionality of a similar passport revocation regime.  As part of 1990s welfare reform, Congress enacted 42 U.S.C. § 652(k), which authorizes the Secretary of Health and Human Services to certify a list of parents owing large child support debts to the Secretary of State, to have their passports revoked.  That statute has survived several

constitutional challenges, although many of the challengers were *pro se*, and invoked underline procedural due process concerns which Mr. Maehr does not raise here (and are better addressed in 26 U.S.C. § 7345).  *E.g. Way v. Tulsa East Child Support Services,* 2017 WL 1036129 (N.D.Okla.).

The two circuit level decisions upholding the child support passport revocation regime against substantive due process challenges are *Weinstein v. Albright*, 261 F.3d 127 (2nd Cir. 2001) and *Eunique v. Powell*, 302 F.3d 971 (9th Cir. 2002).  *Weinstein*'s substantive due process analysis is summary, and (as explained above) wrong.  261 F.3d at 138-39.  The analyses of the three opinions in *Eunique* are far more detailed; and (as explained above) the *Eunique* dissent's analysis is correct.

But even if this Court finds the majority analyses of these cases persuasive, they are distinguishable because child support debts are not ordinary debts (with their trivial impact on the nation's multi-trillion-dollar budget) – the welfare and even lives of **actual children** depend upon payment of child support.  *E.g. Eunique*, 281 F.3d at 974-75  (majority analysis, using rational basis standard, and noting how failure to pay child support is so serious that it can trigger criminal liability); 978 (concurring analysis, reaching same result under an intermediate scrutiny standard).  This substantive due process distinction between collecting a child support debt versus a general money judgment is confirmed by the fact that our common law tradition permits courts to use their extraordinary equitable powers (such as contempt) to compel deadbeat parents to pay child support debts.  *See*, *e.g*., *Pettit v. Pettit*, 626 N.E.2d 444, 446-47 (Ind. 1993) (while ordinary money judgments are not enforceable by contempt, child support orders are); *United States v. Ballek*, 170 F.3d 871, 874-85 (9th Cir. 1999) (per Kozinski, J.) (upholding constitutionality of the federal Child Support Recovery Act, 18 U.S.C. § 228,

which criminalizes willful non-support, based on the government's exceptionally strong interest in protecting children's welfare).  As discussed, there is no comparable common law tradition of compelling debtors to pay ordinary money judgments through such deliberately coercive means.

### 4. The Government's additional arguments lack merit.

The fact that the Supreme Court once metaphorically referred to taxes as the "life-blood of government" in *Bull v. United States*, 295 U.S. 247, 259 (1935), is not sufficient to raise collection of tax debts to the same status as a child support debts, or other compelling government interests like national security.  *See* motion to dismiss at 20.  *Bull* is an early income tax collection case.  It used the "life-blood" metaphor in the course of describing how the government is entitled to obtain money judgments on tax assessments, and collect those judgments through ordinary legal collection methods like levy and execution.  *Id.* at 259-60.  *Bull* is thus perfectly consistent with the substantive due process analysis developed here.

Nor does the fact that some states revoke drivers or professional licenses for nonpayment of taxes support revoking passports.  *See, e.g.*, *Franceschi v. Yee*, 887 F.3d 927, 937-39 (9th Cir. 2018).  Whether rightly or wrongly decided, cases like *Franceschi* involve state-issued licenses, not established federal constitutional rights.

Thus, whether the right of international travel is deemed fundamental or not, the instant passport revocation regime unquestionably violates substantive due process if it revokes a passport to coerce payment of a tax debt without at least establishing *ne exeat* predicates.  Because the Government has not proven these predicates as to Mr. Maehr (and will not be able to), the Secretary of State's revocation of his passport is unconstitutional as applied to him.

## IV.        CONCLUSION

Mr. Maehr's as-applied challenge to the constitutionality of 26 U.S.C. § 7345 is legally sound under both the Supreme Court's disused but applicable privileges and immunities jurisprudence, and also its modern substantive due process jurisprudence. His challenge may not be dismissed under Rule 12.  Indeed, because Mr. Maehr has not secreted assets abroad and is not attempting to so, he will be entitled to summary judgment for the reasons set forth here.

Dated:  July 25, 2019.

Respectfully submitted,

s/*Bennett L. Cohen*
Sean R. Gallagher
Bennett L. Cohen
Megan E. Harry
Polsinelli PC
1401 Lawrence Street, Suite 2300
Denver, CO 80202
Telephone: (303) 572-9300
Email:bcohen@polsinelli.com
*Attorneys for Mr. Maehr in no. 18-cv-2948*

## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of July, 2019, I served a true and correct copy of the foregoing via CM/ECF, which will send electronic notification to all parties and their counsel, including:

E. Carmen Ramirez
United States Department of Justice, Tax Division

*s/ Bennett L. Cohen*
Bennett L. Cohen

-30-