IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 18-cv-2948-PAB-NRN

JEFFREY T. MAEHR, Plaintiff,

v.

UNITED STATES Department of State, including Secretary of State Mike Pompeo, in his official capacity, Defendants.

## MAEHR'S OBJECTIONS TO MAGISTRATE JUDGE NEUREITER'S RECOMMENDATION TO DISMISS [DKT. 55]

Pursuant to F.R.C.P. 72(b)(2), Plaintiff Jeffrey T. Maehr objects to Magistrate Judge Neureiter's recommendation [Dkt. 55] that the Court dismiss his Amended Complaint [Dkt. 32]. Due to page limitations, Mr. Maehr incorporates by reference his Amended Complaint and brief opposing the Government's motion to dismiss [Dkt. 52].

## I. SUMMARY

The IRS has collection tools for tax debts that make private debt collectors drool. In addition to the familiar legal methods of levy and execution, garnishment, etc. the IRS typically enjoys priority over private creditors; super-priority over other government creditors; and the IRS can set off federal benefits like Social Security against debts (as it is doing with Mr. Maehr). But now the Government seeks to go a step further, by revoking tax debtors' constitutional rights until they pay up. That violates basic principles of substantive due process. We enshrine some rights as constitutional rights precisely to prevent the Government from taking them away without a good enough reason; and making debt collection easier is not a good enough reason.

In 2015, Congress decided that revoking tax debtors' passports would increase "tax compliance." *See* Recommendation, Dkt. 55 at 5. The FAST Act's passport revocation regime revokes tax debtors' constitutional right of international travel until they pay their tax debts. But core principles of substantive due process, as well as the Supreme Court's disused but still applicable privileges and immunities jurisprudence, confirm that the Government may not

1

suspend citizens' constitutional right of international travel without a good enough reason, such as national security, foreign policy, or (in the tax debt context, per the holdings of the apposite and controlling *ne exeat* cases) evidence that a tax debtor is trying to prevent collection by secreting assets abroad, or is refusing to repatriate assets that could pay his debt. If merely owing a tax debt were a good enough reason to revoke tax debtors' passports and abridge their right to travel internationally, then federal courts would revoke tax debtors' passports every time the Government asks for a writ of *ne exeat*. But as the late Justice Stevens explained from his Seventh Circuit bench in the leading *ne exeat* case:

> **When the relief impinges upon a constitutionally protected personal liberty, …** the Government has the burden of demonstrating that the **restraint of liberty is a necessary, and not merely coercive and convenient, method of enforcement.**

*United States v. Shaheen*, 445 F.2d 6, 10-11 (7th Cir. 1971) (emphases added).

The Magistrate Judge erred by holding that the Government's interest in collecting tax debts is a good enough reason to revoke tax debtors' established constitutional right of international travel. The Government can collect tax debts many ways (including setoff), but not by revoking tax debtors' constitutional rights until they pay up.

## II. BACKGROUND

Congress enacted the FAST Act in 2015. The new Act's passport revocation regime for tax debtors is codified primarily at 26 U.S.C. § 7345 (Commissioner of Internal Revenue sends a list of seriously delinquent tax debtors to the State Department) and 22 U.S.C. §2714a(e) (State Department revokes their passports).

The Government contends that Mr. Maehr owes a large tax debt. Mr. Maehr has challenged and continues to challenge the Government's tax assessment and judgment collection in other *pro se* actions. This action assumes *arguendo* (and without prejudice to Mr. Maehr's other actions) that Mr. Maehr has been properly certified by the Commissioner of Internal Revenue as owing a "seriously delinquent tax debt" per 26 U.S.C. § 7345. Mr. Maehr's position here is that the State Department may not revoke his passport just because he owes the Government money.

2

The State Department ordered Mr. Maehr to surrender his passport as required by the FAST Act, and he did. Dkt. 32 ¶¶ 17-18, Ex. 1 (passport revocation letter); Dkt. 55 at 3. Mr. Maehr can no longer travel internationally as a result. *Id.*; 8 U.S.C. § 1185(b).

Mr. Maehr filed this action to get his passport reinstated. Undersigned *pro bono* counsel filed the operative Amended Complaint [Dkt. 32], which clarified that this action challenges the constitutionality of the FAST Act's passport revocation regime. The Magistrate Judge correctly understood that this action does not seek to get Mr. Maehr off the list of seriously delinquent tax debtors, but rather seeks an order directed to State Department (and if necessary Secretary of State Pompeo) to reinstate Mr. Maehr's passport. Dkt. 55 at 8-9. (Mr. Maehr is not seeking damages, although he may seek fees under civil rights fee-shifting statutes once he prevails.) The Magistrate Judge also appreciated that Mr. Maehr's claims raise no *Twombly/Iqbal* concerns. The factual basis for Mr. Maehr's complaint is not deficient, vague or implausible – it is simple, straightforward and undisputed. *Id.* at 9. The Government may not hold citizens' constitutional rights hostage to facilitate debt collection – even if Congress (which should know better) says it can.

### III. ARGUMENT

Mr. Maehr developed three reasons below why the passport revocation regime is unconstitutional as applied to him, and presented them in the following logical order:

- it violates the Supreme Court's disused but still vital and applicable privileges and immunities jurisprudence;
- it violates substantive due process because the right of international travel is a fundamental right; and
- it violates substantive due process even if the right of international travel is not fundamental, under the apposite analysis of the *ne exeat* cases.

Dkt. 52. While all three analyses are correct, Mr. Maehr starts with the *ne exeat* analysis because it applies even if the Court accepts the Government's position that the right of international travel is a non-fundamental right that can be regulated under a rational basis standard.

### A. Supreme Court caselaw on the right of international travel.[1]

There are no Tenth Circuit cases construing the right of international travel. This Court therefore applies Supreme Court caselaw. This Court may of course consider other lower federal court decisions, but the Supreme Court cases are binding. If this Court determines that other courts' decisions (even circuit court decisions) do not accurately interpret Supreme Court precedent, this Court follows controlling Supreme Court precedent.

The first Supreme Court cases addressing the right of international travel arose in the 1950s and 1960s, during the Red Scare. In the seminal case of *Kent v. Dulles*, 357 U.S. 116 (1958), the Supreme Court held that the Secretary of State could not deny citizens' passports and thereby restrict their right of international travel because they were communists. The Court based its holding on the historical importance of the right to freedom of movement, including the rights of both interstate and international travel:

> The right to travel is a part of the "liberty" of which the citizen cannot be deprived without due process of law under the Fifth Amendment.... In Anglo-Saxon law, that right was emerging at least as early as the Magna Carta.... Freedom of movement across frontiers in either direction, and inside frontiers as well, was a part of our heritage. **Travel abroad**, like travel within the country, may be necessary for a livelihood. It may be as close to the heart of the individual as the choice of what he eats, or wears, or reads. Freedom of movement is basic in our scheme of values....

*Id.* at 125 (emphases added, and quoting article 42 of the Magna Carta at fn. 12).

The above underlined language is the lexicon of fundamental rights under the Supreme Court's substantive due process jurisprudence. *E.g. Twining v. New Jersey*, 211 U.S. 78, 100-08 (1908) (rights established as "law of the land" in such great documents as the Magna Carta are protected by substantive due process); *McDonald v. City of Chicago,* 561 U.S. 742, 760 (2010) (discussing the lexicon of fundamental rights under substantive due process jurisprudence). Given this fundamental status, the Supreme Court held that the Secretary of State could not refuse to

---

[1] Due to page limitations, this review of the controlling cases will explain why the right of international travel is fundamental, even though the *ne exeat* analysis proceeds from the Government's incorrect position that the right is of lower rank.

issue passports to communists because they were communists. *Id.* at 126-30.[2]

The Court repeated this analysis in the similar case of *Aptheker v. Secretary of State*, 378 U.S. 500, 501 (1964), striking down a provision of the Subversive Activities Control Act which denied passports to communists.

Next, in *Zemel v. Rusk*, 381 U.S. 1 (1965), the Court identified compelling government interests that can justify curtailing the fundamental right of international travel: foreign policy and national security. In upholding the State Department's ban on travel to Cuba, the Court held:

> The right to travel within the United States is, of course, also constitutionally protected. But that freedom does not mean that areas ravaged by flood, fire or pestilence cannot be quarantined when it can be demonstrated that unlimited travel to the area would directly and materially interfere with the safety and welfare of the area or the Nation as a whole. So it is with international travel. That the restriction which is challenged in this case is supported by **the weightiest considerations of national security** is perhaps best pointed up by recalling that the Cuban missile crisis of October, 1962, preceded the filing of appellant's complaint by less than two months.

381 U.S. at 15-16 (emphases added, citation omitted). This analysis did not treat the right of international travel as less than a fundamental right, or less important than the right of interstate travel. To the contrary, per the underlined language, the Supreme Court equated the importance of the two rights and their application under substantive due process principles, holding that the Government needs a truly compelling interest to abridge either right.

It is the language of the Court's next case discussing international travel that has led lower courts astray. In *Califano v. Aznavorian*, 439 U.S. 170 (1978), the Court upheld a provision of the Social Security Act that halted monthly payments of Supplemental Security Income to recipients who are outside the United States for the entire month. The right of international travel was not directly implicated by *Aznavorian* – no one was trying to stop Grace Aznavorian from traveling to

---

[2] The *Kent* majority grounded its holding solely in the fundamental substantive due process status of the right to travel internationally – not the First Amendment. The majority opinion does not mention the First Amendment. (In 1958 even the Supreme Court was apparently hesitant to recognize a First Amendment political right to practice or even advocate communist principles.)

Mexico for medical treatment.  *See* 440 F.Supp. 788, 791 (S.D.Cal. 1977).  Rather, the question decided by the Supreme Court was whether the <u>incidental</u> effect of halting Mrs. Aznavorian's welfare benefits during her Mexican sojourn violated her right to travel internationally.  The Court held that it did not because there is no right to receive government welfare or benefit payments in a manner that is perfectly free of any "incidental" impact on other constitutional rights:

> [T]his case involves legislation providing **governmental payments of monetary benefits that has an incidental effect on a protected liberty**, <u>similar to the legislation considered in *Califano v. Jobst, supra*</u>. There, another section of the Social Security Act was challenged because it "penalized" some beneficiaries upon their marriage. The Court [acknowledged the impact on the fundamental right to marry] but nonetheless upheld the constitutional validity of the challenged legislation.
>
> <u>The statutory provision in issue here does not have nearly so direct an impact on the freedom to travel internationally as occurred in the *Kent, Aptheker,* or *Zemel* cases.</u> **It does not limit the availability or validity of passports.**

439 U.S. at 177 (emphases added), citing *Califano v. Jobst*, 434 U.S. 47 (1977) (upholding a Social Security Act provision terminating government disability benefits upon marriage).[3]

However, in the course of its decision, the *Aznavorian* Court compared the rights of interstate and international travel in the following language:

> The constitutional right of interstate travel is virtually unqualified.  By contrast, the right of international travel has been considered to be no more than an aspect of the liberty protected by the Due Process Clause of the Fifth Amendment. As such, this right, the Court has held, can be regulated within the bounds of due process.

439 U.S. at 176.  This passage is dicta, since the *Aznavorian* Court's holding is that government administration of welfare programs can have an "incidental" impact on the right to travel internationally.  The passage also does not say that the right of international travel is less than a

---

[3] The *Aznavorian* Court's reliance on *Jobst* confirms that its holding is fully consistent with the right of international travel being a fundamental right, since marriage is also a fundamental right for substantive due process purposes and was similarly impacted by a Social Security benefit regulation in *Jobst*.  *See Jobst*, 434 U.S. at 54 and n.10, citing *Loving v. Virginia*, 388 U.S. 1.  The same legal analysis has been employed to uphold "family cap" provisions of welfare laws that ended the prior system of increasing welfare payments based on the recipient's number of children, even though procreative rights are deemed fundamental. *See, e.g., C.K. v. Shalala*, 883 F.Supp. 991, 1014-15 (D.N.J. 1995) (government may not restrict welfare recipients' procreative choices, but it has no constitutional obligation to automatically subsidize them through a welfare program), *aff'd* 92 F.3d 171, 195 (3d Cir. 1996).

fundamental right – that position must be inferred from the juxtaposition of the rights of international and interstate travel, and the description of the latter right as being "virtually unqualified." But a right can be fundamental and still be "qualified" by sufficiently compelling governmental interests, as the right of international travel has been qualified by national security and foreign policy. And "regulation within the bounds of due process" is not necessarily rational basis scrutiny – the phrase describes the entire jurisprudence of substantive due process, including the application of "strict scrutiny" to fundamental rights. Accordingly, the *Aznavorian* dictum, properly understood, did not demote the right of international travel to less than the fundamental status recognized in *Kent*, *Aptheker* and *Zemel*. The *Aznavorian* Court distinguished these cases; it did not overrule or even call into question their holding that the right of international travel is a fundamental right for substantive due process purposes. 439 U.S. at 177.

The next proper right-to-travel case was *Haig v. Agee*, 453 U.S. 280 (1981), where the Court affirmed the Secretary of State's revocation of an ex-CIA agent's passport due to national security concerns, because the agent intended to expose undercover CIA officers in his travels. The Government thus had a plainly compelling interest in restricting Philip Agee's right to travel internationally: national security. The Government did not need to treat the right as less than fundamental. The *Agee* Court nonetheless quoted the above dictum from *Aznavorian* that the right of international travel can be "regulated within the bounds of due process." *Id.* at 307. It is this quotation of the *Aznavorian* dictum in an international travel case that that has led some lower federal courts (though not the Tenth Circuit) to regard the right of international travel as a non-fundamental right, and animates the Government's rational basis position here. But, as explained, *Aznavorian* and *Agee* did not demote the right of international travel from the fundamental status recognized in *Kent*, *Aptheker* and *Zemel*.

B. **The passport revocation regime violates substantive due process even if the right of international travel is not fundamental, per the apposite *ne exeat* cases.**

If this Court accepts the *Aznavorian* dictum as demoting the right of international travel to

7

less than fundamental status, it is still an established constitutional right that must be "regulated within the bounds of due process." *Aznavorian*, 439 U.S. at 176. The Magistrate Judge accepted the Government's argument that because non-fundamental rights are subject to a rational basis type of scrutiny, any legitimate government interest, such as collecting debts, will be a good enough reason to curtail the right. This was error. The Government encroaches the "bounds of due process" when it suspends constitutional rights to coerce payment of a debt.

In our common law tradition, creditors collect money judgments through legal means, such as execution and garnishment. Courts do not enforce money judgments through coercion, *e.g.* by holding the debtor in contempt for non-payment, and imprisoning the debtor until he pays up. *See, e.g., Shuffler v. Heritage Bank*, 720 F.2d 1141, 1147 (9th Cir. 1983) ("The proper means for [a party] to secure compliance with a money judgment is to seek a writ of execution, not to obtain a fine of contempt for the period of nonpayment."); *Ecopetrol S.A. v. Offshore Expl. & Prod. LLC*, 172 F.Supp.3d 691, 698 (S.D.N.Y. 2016) ("[C]ontempt power should not be used to enforce a money judgment....").[4] The Department of Justice and the IRS have developed detailed manuals for collecting tax debts which provide numerous legal techniques for debt collection, but do not instruct government collection lawyers to ask courts to coerce payment by holding debtors in contempt and imprisoning them.[5] The FAST Act's passport revocation regime violates this basic principle of Anglo-American law, and thus substantive due process, because it restricts the established constitutional liberty interest in freedom of movement to coerce payment of a tax debt.

---

[4] Because this is a fundamental common law principle, state authority is naturally similar. *E.g. In re Byrom*, 316 S.W.3d 787, 791 (Tex.App. 2010) ("An order requiring payment of a debt may be enforced through legal processes like execution or attachment, but not by the imprisonment of the adjudicated debtor."); *Carter v. Grace Whitney Properties*, 939 N.E.2d 630, 635 (Ind.App. 2010) (same).

[5] https://www.justice.gov/tax/tax-division-judgement-collection-manual-4-collecting-judgment and https://www.irs.gov/irm/part5; *see United States v. Garcia*, 855 F.3d 615, 621-22 (4th Cir. 2017) (courts may "take judicial notice of information contained on state and federal government websites.").

This is the conclusion reached by the *ne exeat* tax debt cases, which are precisely on point. Before the enactment of 26 U.S.C. § 7345, the Government could and did (and still can) revoke tax debtors' passports to collect tax debts pursuant to 26 U.S.C. § 7402(a), which authorizes federal courts to issue writs of *ne exeat republica* to aid the Government's tax collection efforts. *Ne exeat* is a common law writ that courts may use to prevent a defendant or judgment debtor from frustrating the collection of a money judgment, by ordering the debtor to remain in the court's jurisdiction. *Atherton v. Gopin*, 355 P.3d 804, 808-09 (N.M.App. 2015) (reviewing history of *ne exeat*, collecting cases and authorities). "Because the writ of *ne exeat* operates in restraint of personal liberty, it is to be granted with caution and continued in force with caution." *Id.* at 809 (cleaned up). As particularly relevant here:

> In the absence of a threat to abscond, <u>the writ may not be used as a form of coercing payment of a debt</u>, no matter how just, nor as a form of punishment, no matter how deserved.

*Atherton*, 355 P.3d at 809 (cleaned up, emphasis added). *Accord McKenzie et al v. Cowing*, 4 Cranch CC 479, 16 F.Cas. 202, 203 (U.S. 1834) (courts may not use writ of *ne exeat* to compel payment of a debt; creditor must pursue ordinary legal remedies and collection methods); *Aetna Cas. & Sur. Co. v. Markarian*, 114 F.3d 346, 349 (1st Cir. 1997) (reversing writ of *ne exeat* issued in a non-tax judgment collection proceeding, noting that the writ "hearkens back to the days when debtors were imprisoned for failure to pay their debts. The writ is itself a form of civil arrest.").

Federal courts have applied these common law due process principles in the <u>precise situation at bar</u>: determining whether the Government may revoke a passport as a means of collecting a tax debt under 26 U.S.C. § 7402(a). *See United States v. Shaheen*, 445 F.2d 6 (7th Cir. 1971); *United States v. Robbins,* 235 F.Supp. 353 (E.D.Ark. 1964); *IRS v. Mathewson,* 1993 WL 113434 (S.D.Fla. 1993); *United States v. Barrett*, 2014 WL 321141 (D.Colo. 2014).

In the leading decision of *Shaheen* (written by the late Justice Stevens when he was on the Seventh Circuit), the court discussed how the Government could use the writ of *ne exeat* "to compel a citizen to pay his taxes" by revoking the citizen's passport and thereby preventing him

from leaving the country. 445 F.2d at 9-10. But because the right of international travel is an established constitutional right, per *Kent* and *Aptheker*, the Government may not obtain a writ of *ne exeat* as a matter of course in tax collection cases. Rather, the Government must establish that the tax debtor is attempting to leave the country *with his assets*, or has done so and refuses to repatriate those assets – those are sufficiently compelling reasons to restrict a tax debtor's right to travel internationally, whereas merely owing a tax debt is not. *Id.* at 10-11 ("When the relief impinges upon a <u>constitutionally protected personal liberty</u>, ... the Government has the burden of demonstrating that the restraint of liberty is a <u>necessary, and not merely coercive and convenient</u>, method of enforcement.") (emphases added). *Accord Robbins, supra.*

In *Barrett*, this Court followed *Shaheen* by requiring the Government to establish a *ne exeat* predicate to justify revoking the defendant tax debtors' passports. Judge Jackson held that *ne exeat* was warranted by the Government's extensive evidence that the Barretts had relocated and moved their assets to Ecuador, and owned property of non-trivial value in Ecuador that they could repatriate to pay their tax debt. 2014 WL 321141 at 7-9. *Accord Mathewson, supra.*

Importantly, the *ne exeat* cases do not describe the right of international travel as being a fundamental right; it is only a recognized constitutional right that "cannot be abridged without due process of law," consistent with the *Aznavorian* dictum repeated in *Agee*. *Shaheen*, 445 F.2d at 10; *accord Barrett*, *7. But the cases still hold, on substantive due process grounds, that the Government must have a better reason than debt collection to abridge a tax debtor's established constitutional right of international travel. *Id.*

These *ne exeat* cases establish precisely how the constitutional right to international travel is properly "regulated within the bounds of due process," per the *Aznavorian* dictum. **If the Government's interest in collecting a tax debt were a good enough reason to restrict a tax debtor's constitutional right of international travel, then the *ne exeat* cases would <u>always</u> grant the writ. But they do not, on substantive due process grounds.**

*Robbins* confirms that the size of the tax debt does not matter. David and Beatrice

10

Robbins owed a whopping $434,143 tax debt – in 1964 dollars. 235 F.Supp. at 354. The court nonetheless declined to issue a writ of *ne exeat* because the Government had not rebutted the Robbins' evidence that their travels to Mexico were for health reasons, not to secrete assets. *Id.* at 355-57. By contrast, *Barrett* and *Mathewson* granted the writ because the Government established that the tax debtors had in fact secreted assets abroad. Per *Shaheen*, that is a good enough reason to revoke a tax debtor's passport in a tax collection context; but just owing a tax debt is not.[6]

The Government has not alleged, let alone established, that allowing to Mr. Maehr to travel internationally threatens national security, foreign policy, or even the Government's ability to collect his tax debt (per the *ne exeat* analysis). The Government can collect Mr. Maehr's debt by using its ample legal methods (including the super-priority and setoff rights private creditors do not enjoy), but not by suspending Mr. Maehr's federal constitutional rights until he pays up. Because the Government has not established any adequate predicate for passport revocation as to Mr. Maehr (and will not be able to, as Mr. Maehr will show at summary judgment), the new FAST Act's passport revocation regime is unconstitutional as applied to him.

C.   **The right to travel internationally is a fundamental right.**

The above substantive due process analysis does not rely on the right of international travel being deemed a fundamental right. But it is. As shown above, the controlling Supreme Court caselaw describes the right of international travel as a fundamental right, per *Kent*, *Aptheker* and *Zemel*. The Supreme Court has never demoted the right to less than fundamental status – it has only distinguished *Kent*, *Aptheker* and *Zemel* in dicta in the *Aznavorian* case, which did not even involve a direct challenge to the right of international travel.

---

[6] Indeed, if the Government's position prevails here, then why should it stop at revoking tax debtors' constitutional right to international travel? Congress's next logical and legally permissible step would be to enact a statute suspending tax debtors' Fourth Amendment rights until they pay up, and authorizing IRS revenue agents to conduct warrantless searches of debtors' homes to seize money and valuables to satisfy their tax debts. The Magistrate Judge's ruling to the contrary, Dkt. 55 at 17, misapprehends the role of substantive due process in our system of governance.

This Court may not follow the analysis of other circuit courts that treat the right of international travel as a second-tier constitutional right. Given the absence of any controlling Tenth Circuit law, this Court must apply the plain language of the Supreme Court's own analyses, and leave it to the Supreme Court to reconsider or further clarify the law it has laid down. *See Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, [lower courts] should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.").

The above substantive due process analysis applies even more strongly when the Court correctly treats the right of international travel as a fundamental right.

### D. The prior passport revocation regime to collect child support is distinguishable – children's lives and welfare depend on child support.

The Magistrate Judge's dismissal recommendation also erroneously relied on decisions from some lower federal courts upholding the constitutionality of a similar passport revocation regime to collect child support debts. Dkt. 55 at 16.

As part of 1990s welfare reform, Congress enacted 42 U.S.C. § 652(k), which authorizes the Secretary of Health and Human Services to certify a list of parents owing large child support debts to the Secretary of State, to have their passports revoked. That statute has survived constitutional challenges in other circuits. It has not been considered by the Supreme Court or Tenth Circuit. (Also, many of the challengers were *pro se*, and invoked procedural due process concerns which Mr. Maehr does not raise here.)

The two circuit-level decisions upholding the child support passport revocation regime against substantive due process challenges are *Weinstein v. Albright*, 261 F.3d 127 (2nd Cir. 2001) and *Eunique v. Powell*, 302 F.3d 971 (9th Cir. 2002). *Weinstein*'s substantive due process analysis is summary, and (as explained above) wrong. 261 F.3d at 138-39. The Ninth Circuit panel in *Eunique* wrote three opinions which contain far more detailed substantive due process analyses.

12

None of the *Eunique* opinions considers *ne exeat* principles, but the *Eunique* dissent gets the substantive due process analysis right. *Id.* at 985 (prophetically predicting that if passports could be revoked to coerce payment of child support debts, tax debts would be next).

But even if this Court finds the majority analyses of these cases persuasive, they are distinguishable because child support debts are not ordinary debts. The welfare and even lives of actual children depend upon payment of child support. *Eunique*, 281 F.3d at 974-75 (majority analysis, using rational basis standard, and noting how failure to pay child support is so serious that it can trigger criminal liability) and 978 (concurring analysis, reaching same result under an intermediate scrutiny standard); *see also United States v. Ballek*, 170 F.3d 871, 874-85 (9th Cir. 1999) (per Kozinski, J.) (upholding constitutionality of the federal Child Support Recovery Act, 18 U.S.C. § 228, which criminalizes willful non-support, based on the government's exceptionally strong interest in protecting children's welfare). That is why our common law tradition allows courts to use their extraordinary contempt powers to compel parents to pay child support debts. *See, e.g., Pettit v. Pettit*, 626 N.E.2d 444, 446-47 (Ind. 1993) (while ordinary money judgments are not enforceable by contempt, child support orders are). There is no comparable common law tradition of compelling debtors to pay ordinary money judgments through such deliberately coercive means. *Id.*[7]

E.   The passport revocation regime violates privileges and immunities jurisprudence.

The Supreme Court's civil rights jurisprudence under the Privileges and Immunities Clauses is widely regarded as having become a dead letter after the *Slaughter-House Cases*, 83 U.S.

---

[7] The fact that the Supreme Court once metaphorically referred to taxes as the "life-blood of government" in *Bull v. United States*, 295 U.S. 247, 259 (1935), does not raise collection of tax debts to the same status as a child support debts, or other compelling government interests like national security. *Cf.* Recommendation, Dkt. 55 at 16. *Bull* is an early income tax collection case. It used the "life-blood" metaphor in the course of describing how the Government is entitled to obtain money judgments on tax assessments, and collect those judgments through <u>ordinary</u> legal collection methods like levy and execution. *Id.* at 259-60. *Bull* does not hold that the Government can collect tax debts by revoking tax debtors' constitutional rights until they pay up.

13

36 (1873), and their progeny limited its scope to the relatively few civil rights that stem from national rather than state citizenship. *See McDonald v. City of Chicago,* 561 U.S. 742, 754-66 (2010). But that truncated privilege and immunities civil rights jurisprudence is still authoritative, *id.*; *Rodriguez, supra*; and it fits perfectly here.

The right of international travel is a "privilege" of citizenship – *i.e.* a constitutionally protected civil right. It does not need to be "newly recognized," as the Magistrate Judge believed, *see* Dkt. 55 at 12; it was recognized as an established constitutional right, grounded in the Fifth Amendment, by the Supreme Court in *Kent*.[8] The right stems from national rather than state citizenship. *See Zschernig v. Miller,* 389 U.S. 429, 441 (1968) (states have no authority to regulate international travel); 8 U.S.C. § 1185(b) (federal law requiring citizens to have a valid U.S. passport, issued by the State Department, to enter or exit the country); 6 U.S.C. § 201 *et seq.* (creating new federal Department of Homeland Security to control travel over borders).

The parallel right of <u>interstate</u> travel has been protected under the *Slaughter-House* privileges and immunities paradigm. *See Edwards v. California,* 314 U.S. 160, 178 (1941); *Twining*, 211 U.S. at 97; *Crandall v. Nevada*, 73 U.S. 35 (1868). As relevant here, *Crandall* confirms that a government's legitimate interest in raising money is not a good enough reason to abridge citizens' federally-recognized privileges, such as the right of interstate travel. 73 U.S. at 43-45 (striking down Nevada statute imposing a head tax on persons leaving the state because Nevada's legitimate interest in raising revenue yields to the constitutional right of interstate travel). The established right of <u>international</u> travel is entitled to the same treatment – the Government needs a sufficiently strong reason to abridge either right. *Zemel*, 381 U.S. at 15-16. Debt collection is not a good enough reason. *Crandall, supra.*

---

[8] Mr. Maehr mistakenly argued below that the right of international travel was grounded in Article IV Section 2 Privileges and Immunities Clause. That clause, like the Fourteenth Amendment, is not the source of any privileges, but protects recognized privileges from abridgment by the states.

Just as states may not impair constitutionally protected federal privileges under the Fourteenth Amendment, per the *Slaughter-House Cases*, the Federal Government may not do so either per the familiar analysis of *Bivens*. *E.g. Davis v. Passman*, 442 U.S. 228 (1979) (applying *Bivens* to a Fifth Amendment violation); *Ziglar v. Abbasi*, 137 S.Ct. 1843 (2017) (declining to expand *Bivens*'s damage remedies in part because injunctive relief is an available remedy for constitutional violations by the federal government).[9]

## IV. CONCLUSION

Congress sometimes passes laws that it knows, or should know, are plainly unconstitutional. *See Texas v. Johnson*, 491 U.S. 397 (1989) (striking down Texas's flag-burning statute on First Amendment grounds); *United States v. Eichman*, 496 U.S. 310 (1990) (striking down federal flag-burning law enacted after *Johnson* for the same reasons). The FAST Act's passport revocation regime is plainly unconstitutional under the Supreme Court's modern substantive due process jurisprudence, and also its disused but still authoritative and applicable privileges and immunities jurisprudence. Indeed, because Mr. Maehr has not secreted assets abroad and is not attempting to do so, he will be entitled to summary judgment for the reasons set forth here. The Court should therefore reject the Magistrate Judge's recommendation to grant the Government's motion to dismiss, and allow this action to move forward.

Dated: October 10, 2019.  Respectfully submitted,

s/*Bennett L. Cohen*
Bennett L. Cohen, bcohen@polsinelli.com
Sean R. Gallagher, Megan E. Harry
Polsinelli PC, 1401 Lawrence Street, Suite 2300
Denver, CO 80202, Telephone: (303) 572-9300

---

[9] This is not a *Bivens* action because Mr. Maehr is not seeking damages – just injunctive relief to remedy unconstitutional action by a federal officer, which the Supreme Court has long acknowledged is an available remedy to correct constitutional violations like the one at bar. *See Dugan v. Rank*, 372 U.S. 609, 621-22 (1963) (where federal officer's exercise of powers is "constitutionally void," "the officer's action can be made the basis of a suit for specific relief against the officer as an individual."); *Abbasi, supra*.

## CERTIFICATE OF SERVICE

I hereby certify that on October 10, 2019, I served a true and correct copy of the foregoing via CM/ECF, which will send electronic notification to all parties and their counsel, including:

E. Carmen Ramirez
United States Department of Justice, Tax Division

*s/ Bennett L. Cohen*
Bennett L. Cohen
