**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLORADO**

Civil Action No. 1:18-cv-02948-PAB-NRN

JEFFREY T. MAEHR,

    Plaintiff,

    v.

U.S. STATE DEPARTMENT,

    Respondent.

---

THE UNITED STATES' RESPONSE TO PLAINTIFF'S OBJECTIONS TO
MAGISTRATE JUDGE NEUREITER'S RECOMMENDATION TO DISMISS (Dkt. 59)

---

Magistrate Judge Neureiter has issued a Report and Recommendation (Dkt. 55, the "R&R") recommending that plaintiff Jeffrey Maehr's complaint be dismissed with prejudice. The United States filed a limited objection to address a jurisdictional defect (Dkt. 58), but otherwise agrees with the recommended outcome. However, Mr. Maehr disagrees with the R&R in almost every respect, and has filed his own objection. (Dkt. 59). The United States hereby responds.

**I.   INTRODUCTION**

The R&R thoroughly analyzed Mr. Maehr's challenge to 26 U.S.C. § 7345 and found it lacking on all fronts. As the R&R discussed in its detailed background section,

1

§ 7345 directs the IRS to identify a narrow class of delinquent taxpayers who have proved resistant to the IRS's normal collections or settlement procedures, and restricts those taxpayers' passport eligibility. Mr. Maehr suggests that he, and similarly situated individuals, should be free to enjoy the privileges of international travel and the protections of a U.S. passport without meeting one of the basic obligations of U.S. citizenship. He is incorrect, and the Court should dismiss his suit.

## II. ARGUMENT

### A. The R&R Correctly Determined § 7345 Does Not Violate Due Process.

Mr. Maehr's suit is premised on the notions that: 1) there is a fundamental right to international travel; and 2) the government's interest in collecting taxes is not important enough to justify curtailing that right. Determining whether a right is "fundamental" matters, because the characterization affects the standard of review. Legislation that restricts fundamental rights is generally subject to strict scrutiny, while legislation that limits lesser freedoms is subject to more deferential review. (R&R at 14); *Dawson v. Bd. of Cty. Comm'rs*, 732 F. App'x 624, 629 (10th Cir. 2018); *see also Mohamed v. Holder*, 266 F. Supp. 3d 868, 876-79 (E.D. Va. 2017) (recognizing differing standards of review applied to international versus interstate travel). That said, classifying a right as fundamental is not necessarily dispositive. Even fundamental rights are subject to limitations in appropriate circumstances. Here, however, Mr. Maehr is wrong on both fronts. There is no fundamental right to international travel, and even if there were, § 7345 would be a permissible restriction on it.

### *1. There is no fundamental right to international travel.*

As the R&R observed, the Supreme Court "has indicated that there is no fundamental right to international travel." (R&R at 16). True, courts have long recognized a right to interstate travel. *See, e.g.*, *Califano v. Aznavorian*, 439 U.S. 170, 176 (1978).[1] Courts have also recognized the freedom to travel internationally. But the two are not the same. The right to travel interstate is almost unqualified, but the freedom to travel internationally is just one component of the liberty protected under the Fifth Amendment, which provides that "[n]o person shall be ... deprived of life, liberty, or property, without due process of law[.]" *See, e.g.*, *Haig v. Agee*, 453 U.S. 280, 306 (1981) ("[T]he *freedom* to travel outside the United States must be distinguished from the *right* to travel within the United States.") (emphasis in original).[2]

The freedom to travel internationally can therefore be regulated within the bounds of due process. *See, e.g.*, *Aznavorian*, 439 U.S. at 176. Indeed, as Mr. Maehr acknowledges, courts have repeatedly upheld a provision very similar to § 7345 that allows the State Department to restrict passports for non-payment of child support. *See* 42 U.S.C. § 654(31) and § 652(k); *Weinstein*, 261 F.3d at 140; *Risenhoover v.*

---

[1] As noted at oral argument, that right may stem at least in part from the framers' belief that the ability to move among the states was necessary to the new union's structure. *See Saenz v. Roe*, 526 U.S. 489, 501 (1999).

[2] *See also, e.g.*, *Aznavorian*, 439 U.S. at 171 ("[L]egislation which is said to infringe the freedom to travel abroad is not to be judged by the same standard applied to laws that penalize the right of interstate travel"); *Weinstein v. Albright*, 261 F.3d 127, 140 (2nd Cir. 2001) (the "right to a passport and to travel internationally, while a liberty interest protected by the Due Process Clause of the Fifth Amendment, is not a fundamental right equivalent to the right to interstate travel").

*Washington Cnty. Comm. Servs.*, 545 F. Supp. 2d 885, 890-91 (D. Minn. 2008) (rejecting equal-protection and substantive-due-process challenges). (*See also* Dkt. 46 at ECF pg. 21-22 (detailing child support program's operation and providing additional case citations)). Mr. Maehr asserts that the child support program applies to "large child support debts." (Dkt. 59 at 12). In actuality, the child-support program targets debtors who owe as little as $2,500, a fraction of § 7345's $50,000 floor (which is indexed for inflation). And child support is not the only context in which Congress may limit international travel. Courts have upheld a broad range of other restrictions that may limit or prevent international travel, restrictions that would be hard to reconcile with a fundamental right. (*See* Dkt. 46 at ECF pg. 19-20 (collecting examples with citations)).[3]

Mr. Maehr disagrees with this entire body of case law. He asks this Court to depart from the overwhelming weight of authority and to find that there is a fundamental right to international travel. He argues that to the extent the Supreme Court (and lower courts) have said that international and interstate travel are different, they are relying on mere *dicta* and have departed from the Supreme Court's 1958 decision in *Kent v. Dulles*, 357 U.S. 116 (1958). But surely the Supreme Court is capable of reading its own precedents. It is Mr. Maehr who misconstrues *Kent* and its progeny.

*Kent* arose because the Secretary of State denied passports to two suspected communists, pursuant to State Department regulations. The question the Court decided

---

[3] Among other examples, the government can deny passports to those who fail to provide Social Security numbers, or who default on consular loans; it can allow citizens to be extradited and face imprisonment abroad; it can impose quarantines; and it can conduct warrantless searches near international borders. (Dkt. 46 at ECF pg. 19-20).

was not the breadth of the plaintiffs' travel rights, but an issue of administrative law: whether the State Department had overstepped its authority in promulgating the regulations. The fact that the denial infringed on the plaintiffs' "beliefs and associations" was key to the holding:

> "[W]e do not reach the question of constitutionality. ***We only conclude that § 1185 [of the Immigration and Nationality Act of 1952] and § 211a [of a 1926 law regarding the Secretary's passport authority] do not delegate to the Secretary the kind of authority exercised here***. We deal with beliefs, with associations, with ideological matters. … *[Plaintiffs] are being denied their freedom of movement solely because of their refusal to be subjected to inquiry into their beliefs and associations*. They do not seek to escape the law nor to violate it."

*Id*. at 129-30 (emphasis added).

Certainly, the Court observed that freedom of movement, including the ability to travel internationally, is an important personal liberty. *See id*. at 125-27. But the Court recognized that such liberty cannot be restricted "without due process of law," not that it is inviolable. *Id*. at 125. It was the Secretary's reason for restricting that liberty that troubled the majority.[4] The Court was unwilling to allow the Secretary to abridge a liberty interest by regulation, when the authorizing statutes did not explicitly provide for it, merely because of the applicants' political beliefs.

---

[4] *See also id.* at 130 ("We would be faced with important constitutional questions were we to hold that Congress … had given the Secretary authority to withhold passports to citizens **because of their beliefs or associations**. Congress has made no such provision in explicit terms; and absent one, the Secretary may not employ that standard to restrict the citizens' right of free movement.").

Thus, Mr. Maehr's claim that *Kent* "grounded its holding solely in the fundamental substantive due process status of the right to travel internationally," and did not concern what we now consider First Amendment freedoms, is simply incorrect. (*See* Dkt. 59 at 5 n. 2). Mr. Maehr says the *Kent* majority does not mention the words "First Amendment." (*Id.*).[5] That is because the *Kent* court explicitly declined to reach the constitutional questions, deciding instead that the Secretary had overstepped his regulatory authority. (*See Kent*, 357 U.S. at 129-30 ("[W]e do not reach the question of constitutionality…")). Moreover, the Court decided *Kent* in 1958. At the time, freedom of association jurisprudence was in its infancy.[6] Yet the *Kent* majority was clearly troubled by the Secretary's basis for denying passports, not just the effect of the denial on the applicants' ability to travel.

Similar issues arose a few years later, in *Aptheker v. Secretary of State*, 378 U.S. 500, 501 (1964). *Aptheker* concerned not a regulation, but a statute: a statute that made it a crime for members of communist groups, including so-called "Communist-front" groups, to apply for or use passports. *Id*. at 501-02. The Court recognized the freedom to travel as an important Fifth Amendment liberty. *Id*. at 505-06. It found that the statute swept too far, and was too loosely connected to its purported national security objectives, to meet the Fifth Amendment's requirements. It did not find that the

---

[5] The dissent does mention the First Amendment, but only to observe that since the majority's opinion turned on the extent of the Secretary's regulatory authority, the dissent would not address the constitutional issues. *Id.* at 143.

[6] The Court decided *NAACP v. Ala. Ex rel. Patterson*, 357 U.S. 449 (1958), one of the seminal freedom of association cases, two weeks after *Kent*.

right to international travel was inviolable. *Id*. at 508-14. The statute swept up all members of any targeted organization, due solely to their membership—regardless of a member's degree of activity in the organization, whether the member agreed with all of the organization's goals, or where the member wished to travel, or for what purpose. *Id*. at 512-14. Applicants could escape the statute only by abandoning their association with the targeted organizations. But since it was by then clear that "freedom of association is itself guaranteed in the First Amendment[,]" the Court found giving up membership too high a price to pay. *Id*. at 507.

Mr. Maehr contends that subsequent decisions that distinguished the right to travel interstate from the freedom to travel internationally are inconsistent with *Kent* and *Aptheker*, and have led lower courts astray. (Dkt. 59 at 5-7 (discussing *Aznavorian* and *Haig*)). But that is only because he misreads *Kent* and *Aptheker*. *Cf Haig*, 453 U.S. at 306 ("[T]he *freedom* to travel outside the United States must be distinguished from the *right* to travel within the United States."). Neither *Kent* nor *Aptheker* held that Congress cannot restrict international travel, if it provides for due process, and neither case equated domestic and international travel. The R&R appropriately rejected Mr. Maehr's attempts to conflate the two. This Court should do the same.

### 2. Even if there were a fundamental right to international travel, § 7345 would be a permissible restriction.

#### a. The statute is narrowly tailored to meet a compelling need.

Because the R&R, like the overwhelming majority of federal courts, determined that there is no fundamental right to international travel, it applied rational basis review. (*See* Dkt. 55 at 17). The R&R correctly determined that enforcing the federal tax laws

7

and collecting taxes are legitimate legislative purposes, and that the statute is rationally tied to those goals. (*Id*.) That is sufficient justification. *See*, *e.g.*, *Mohamed*, 266 F. Supp. 3d 868, 876-83 (E.D. Va. 2017) (applying rational basis review to the extent a program restricted international travel, but higher scrutiny for restrictions on domestic travel).

However, the R&R also recognized that even if strict scrutiny applied, *i.e.*, even if there were a fundamental right to international travel, the statute would still pass muster. (*See* Dkt. 55 at 17). As the R&R reflects, Congress had important and substantial reasons for passing § 7345. *Id.* Indeed, the need for tax revenues is not only important, but compelling. *Bull v. United States*, 295 U.S. 247, 259 (1935) ("[T]axes are the life-blood of government, and their prompt and certain availability an imperious need."). Without revenue, the government cannot provide for the national defense or support needy children—needs Mr. Maehr appears to agree are compelling—nor provide any of its other basic services.[7]

The R&R also recognized that the statute was narrowly tailored to serve those purposes. (Dkt. 55 at 17). As the R&R discussed in its detailed background section, the statute reaches only a carefully defined sub-set of delinquent taxpayers, *i.e.*, those whose outstanding obligations exceed $50,000, indexed for inflation, and only if such taxpayers also meet a variety of other criteria. (*Id*. at 6-8). The upshot of these

---

[7] Indeed, when it comes to taxes, courts have even upheld restrictions that impact interstate travel. *See e.g.*, *Franceschi v. Yee*, 887 F.3d 927 (9th Cir. 2018), *cert. denied*, 139 S. Ct. 648 (2018) (rejecting challenge to state law that provided for suspension of drivers' licenses for delinquent state taxpayers).

requirements is that the statute only reaches taxpayers with substantial outstanding liabilities; who have had the right to dispute the amounts; and who have not entered into agreed-upon payment plans or settlements, which can take the taxpayer's ability to pay into account. (*Id*.). The IRS must have already attempted to collect the debt through standard administrative procedures (*i.e.*, liens or levies, which themselves provide taxpayers additional administrative rights). (*Id*. at 7). Taxpayers cannot be certified if they have a pending request for so-called innocent spouse relief, or a pending settlement proposal, and there are various opportunities to reinstate passport eligibility. (*Id*. at 7-8; *see also* 26 U.S.C. § 7345(b)(2)). The statute and related law also allow the Secretary to issue passports to allow travel in emergency situations or for humanitarian reasons (*e.g.,* to allow a visit to a sick relative). (Dkt. 55 at 8).

Mr. Maehr has suggested that these are only "procedural" protections, and that he does not challenge the statute on procedural grounds. (Dkt. 52 at ECF pg. 7-8). But they are more than that: the various safeguards have substantive due process implications, because they narrow the class of taxpayers who can be deemed passport ineligible, and provide reasonable avenues for reversal. Unlike the statute in *Aptheker*, § 7345 does not require that taxpayers give up First Amendment freedoms to regain passport eligibility. And unlike the statute in *Aptheker*, or the regulation in *Kent*, § 7345 does not target law-abiding citizens merely because of their protected beliefs or associations. There is a right to association. There is not a right to evade taxes.

This highlights another error in Mr. Maehr's objections. He constantly suggests that § 7345 allows the government to restrict passports until a debtor "pays up." (*See*,

*e.g.* Dkt. 59 at 1, 8, 11, and 13 n. 7). This is misleading, even as a rhetorical flourish, because § 7345 contains no requirement that a taxpayer pay in full. Circumstances change: a taxpayer who ran up significant debts might now have limited means. The statute allows taxpayers to work with the IRS to resolve their obligations on appropriate terms. *See* § 7345(b)(2) and (c)(2)(B) and (C). The statute certainly targets taxpayers who refuse to engage with the IRS and to meet their basic civic responsibilities. But it does not seek to penalize taxpayers who cannot pay off their obligations but who are making good-faith efforts.

This leads to another error, one that goes beyond rhetoric. Mr. Maehr has also repeatedly suggested that taxes are simply "ordinary" debts. (*See*, *e.g.*, Dkt. 32 at 9 ("The Government has no such heightened interest in the collection of ordinary debts, such as tax debts."); Dkt. 59 at 13). But taxes (federal or state) are **not** ordinary debts. They are duties owed to the sovereign, as federal courts have observed in a variety of contexts. *See*, *e.g.*, *Brown Bark I, L.P. v. Traverse City Light & Power Dep't*, 736 F. Supp. 2d 1099, 1110-11 (W.D. Mich. 2010) (recognizing "the longstanding distinction drawn in various legal contexts between taxes and ordinary debts."); *quoting Meriwether v. Garrett*, 102 U.S. 472, 513-14 (1880) ("Taxes are not debts . . . . Debts are obligations for the payment of money founded upon contract, express or implied. Taxes are imposts levied for the support of the Government, or for some special purpose authorized by it. The consent of the taxpayer is not necessary to their enforcement.") (per JJ. Field, Miller and Bradley, speaking for a plurality) (add'l case citations omitted); *see also Bull,* 295 U.S. at 260 (distinguishing between the processes for collecting

ordinary judgment debts and the processes applicable to tax collection, because "what is being accomplished is the recovery of a just debt owed the sovereign").

That is why, as even Mr. Maehr recognizes, the IRS has a variety of collections tools not available to ordinary creditors. (Dkt. 59 at 1). That does not mean the IRS has boundless authority, or that taxpayers have no due process rights. But it does mean that ordinary debt collection restrictions do not apply to the IRS, and Mr. Maehr's attempt to invoke the restrictions that apply to private debt collectors fails.

### b. The procedures applicable to the writ *ne exeat republica* do not alter the analysis.

Mr. Maehr has argued that § 7345 is unconstitutional because it does not employ the same set of safeguards that courts apply when issuing the writ *ne exeat republica*. The R&R properly rejected this argument. (Dkt. 55 at 17-18). The writ is a rarely used common-law device, though the tax code explicitly recognizes courts' power to impose it when appropriate. *See* 26 U.S.C. § 7402(a). It "is an extraordinary collection remedy which may result in a taxpayer being temporarily confined in prison[.]" IRS Field Service Advisory, Nov. 20, 1998, 1998 WL 1757128. It is often (though not always) employed to restrict a taxpayer from leaving the immediate jurisdiction, or even to impose house arrest, thus potentially infringing on the right to interstate travel. *See id*. (*See also* Dkt. 46 at ECF pg. 27 (collecting cases)).

Mr. Maehr argues that the government can obtain the writ only on a showing that a taxpayer is attempting to secrete assets abroad, or is refusing to repatriate them, and that because § 7345 does not contain a similar requirement, it does not offer due process. (Dkt. 59 at 9-11). He asserts that while hiding assets abroad may justify

11

passport restrictions, "just owing a tax debt does not." (Dkt. 59 at 11). (Once again, Mr. Maehr over-simplifies § 7345. The statute does not "just" require a tax debt, it requires that the debt be substantial (many times the amount applicable for child support), among other requirements.)

It makes sense for courts to impose high standards in a proceeding that may deprive a taxpayer of immediate liberty on unique facts, when there is limited legislative guidance. Section 7402 says the writ may issue when "necessary or appropriate," but does not define those terms. Courts considering the writ must decide these issues case-by-case, considering such factors as what dollar amounts are appropriate; whether the taxpayer could reasonably contest the liability; or whether the IRS could collect using less drastic remedies.

This does not mean the requirements courts impose for issuing the writ are the only requirements that afford adequate due process. There is no reason that Congress should be bound to the specific tests courts employ, so long as Congress has otherwise provided due process. And as the R&R properly determined, § 7345 provides adequate protections in its own right.

### B. Mr. Maehr Has Conceded His Initial Privileges And Immunities Claim, And His Revised Claim Also Fails.

Mr. Maehr previously asserted that § 7345 "violates the Constitution's Article IV Section 2 Privileges and Immunities Clause." (Dkt. 52 at 12 *et seq*.). This was a novel theory. The *Slaughterhouse Cases* severely limited privileges and immunities jurisprudence, and courts have rarely, if ever, analyzed the extent to which international travel is a core privilege of citizenship. His theory was not just novel, it was also

incorrect. Section 7345 is a federal statute, not a state law, and courts have repeatedly held that "the Privileges and Immunities Clause of Article IV does not constrain the powers of the federal government at all." *Pollack v. Duff*, 793 F.3d 34, 40-41 (2015); *Bishop v. Okla. ex rel. Edmondson*, 447 F. Supp. 2d 1239, 1252 (N.D. Okla. 2006) (similar), *rev'd on other grounds*, 333 Fed. Appx. 361 (10th Cir. 2009).

Moreover, as the R&R correctly observed, courts should express the utmost care when asked to break new ground in this field. (Dkt. 55 at 13); *citing Washington v. Glucksberg*, 521 U.S. 702, 720 (1997). Mr. Maehr could not point to any precedent that analyzed international travel in the privileges and immunities context. The "mere novelty" of his theory is evidence that international travel is not so deeply "rooted in the traditions and conscience of our people as to be ranked as fundamental[,]" whether he calls it a "right" or a "privilege." *See Reno v. Flores*, 507 U.S. 292, 303 (1993). The R&R properly declined to recognize a new privilege here.

In his Objections, Mr. Maehr concedes that the Article IV, Section 2 privileges and immunities clause, like the privileges or immunities clause in the Fourteenth Amendment, applies against state action only. (Dkt. 59 at 14 n. 8). However, he now says that this Court does not need to recognize a new privilege, because the Supreme Court had already recognized international travel as, in his words, "an established constitutional right, grounded in the Fifth Amendment" in *Kent*. (*Id*. at 14).

That is a semantic argument at best. Whether he calls international travel a "privilege" or a "fundamental right", the outcome is the same. As discussed above, *Kent* recognized international travel as an important liberty, but the Court also recognized

13

that such liberty can be restricted. Mr. Maehr's reliance on *Crandall v. Nevada*, 73 U.S. 35 (1868), is thus misplaced. *Crandall* struck down a tax the state of Nevada imposed on travelers for exercising the "privilege" of leaving the state. 73 U.S. at 40. In Mr. Maehr's view, that means raising tax revenue is not sufficient enough reason to curtail travel. But the Nevada law infringed on interstate travel, not international travel, and courts do not apply the same standard to the two. Moreover, unlike § 7345, the Nevada law applied to all travelers (or, more technically, to the stage coach and railway companies that transported them), not to a narrowly defined class of tax evaders. Section 7345 would pass strict scrutiny even if the law in *Crandall* would not. Mr. Maehr acknowledges that "privileges" can be restricted if there is a "sufficiently strong reason", and he has not shown that the restrictions would be any less appropriate if the freedom to travel internationally was called a privilege.

### III. CONCLUSION

For the reasons stated above and in the United States' prior briefing, the Court should adopt the R&R's recommendation, and order that Mr. Maehr's complaint be dismissed with prejudice.

DATED: October 24, 2019

RICHARD E. ZUCKERMAN
Principal Deputy Assistant Attorney General

*/s/E. Carmen Ramirez*
E. CARMEN RAMIREZ
Trial Attorney, Tax Division
U.S. Department of Justice
Post Office Box 683

Ben Franklin Station
Washington, D.C. 20044
Tel.: (202) 616-2885
FAX: (202) 307-0054
Email: E.Carmen.Ramirez@usdoj.gov

Of counsel:

JASON R. DUNN
United States Attorney

*Attorneys for the United States*

## CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED that service of the foregoing is made this 24th day of October, 2019, via ECF.

*/s/ E. Carmen Ramirez*
E. Carmen Ramirez
Trial Attorney, Tax Division
U.S. Department of Justice
